[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 19, 2009
THOMAS K. KAHN
CLERK

_____

No. 07-11301

_____

D. C. Docket No. 05-20571-CR-PAS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DEWITT JACKSON MAXWELL,
 a.k.a. JACK,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 19, 2009)

Before BIRCH and MARCUS, Circuit Judges, and FORRESTER,* District Judge.

MARCUS, Circuit Judge:

_____

* Honorable J. Owen Forrester, United States District Judge for the Northern District of Georgia, sitting by designation.

As a result of his participation in a fraudulent scheme to obtain construction contracts set aside for socially and economically disadvantaged companies at Miami International Airport ("MIA"), Dewitt Jackson Maxwell was convicted by a jury in the United States District Court for the Southern District of Florida of mail fraud, wire fraud, conspiracy to commit mail and wire fraud, money laundering, and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 2, 1341, 1343, 1349, 1956, and 1957. He was subsequently sentenced to a term of imprisonment of sixty months followed by twenty-four months of supervised release.

Maxwell appeals both his convictions and the resulting sentence. He argues broadly that his convictions must be overturned on three grounds: (1) his right to cross-examination was wrongfully limited by the district court in violation of the Sixth Amendment; (2) the convictions were not supported by sufficient evidence; and (3) the rejection of his proffered jury instructions on a "good faith" defense amounted to clear error. Maxwell also says that his sentence must be reversed, because the district court clearly erred in calculating the amount of loss enhancement applicable to his sentence under § 2B1.1 of the Sentencing Guidelines. After thorough review, we affirm the convictions and the sentence.

I.

Maxwell was indicted by a grand jury in the Southern District of Florida on twenty-four counts of mail and wire fraud, money laundering, and related conspiracies,[1] arising out of his involvement with six electrical subcontracts at MIA while he was Vice President, and the executive in charge, of Fisk Electrical Corporation's South Florida office ("Fisk").

A.      The Trial

The essential facts taken in a light most favorable to the jury's verdict are these. Of the six MIA contracts involved in this case, five were funded by Miami-Dade County (the "County") and required compliance with the County's Community Small Business Enterprise ("CSBE") program.[2] This program sets aside a certain percentage of the County's construction work to be performed by

---

[1] Specifically, Count 1 charged conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349; Counts 2 and 3 charged wire fraud in violation of 18 U.S.C. §§ 1343 and 2; Counts 4-13 charged mail fraud in violation of 18 U.S.C. §§ 1341 and 2; Count 14 charged conspiracy to commit promotional and concealment money laundering in violation of 18 U.S.C. § 1956(h); Count 15 charged conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h); Counts 16-20 charged money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2; and Counts 21-24 charged money laundering in violation of 18 U.S.C. §§ 1957 and 2.

[2] The CSBE program is a County program set forth in County Ordinance 97-52 codified at § 1033.02 of the Miami-Dade County Code and Administrative Order 3-22. A CSBE is "a construction related enterprise . . . which has an actual place of business in Miami-Dade County" and has an average gross revenue below a specified amount. Under the CSBE program, a specified percentage of any covered County construction project must be completed by a CSBE. This quota is satisfied only if the CSBE performs a "commercially useful function."

qualifying small, local businesses. The sixth MIA contract was federally funded and required compliance with the Disadvantaged Business Enterprises ("DBE") program.[3] To obtain and maintain a contract under these programs, a CSBE or DBE must perform a commercially useful function in the completion of the contract. A commercially useful function occurs when the CSBE or DBE actually performs, manages, and supervises the work involved. County Ordinance 97-52; 49 C.F.R. § 26.55(c)(1). "A DBE does not perform a commercially useful function if its role is limited to that of an extra participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of DBE participation." 49 C.F.R. § 26.55(c)(2).

Because Fisk is a large Texas-based electrical contracting corporation with offices nationwide, it is not eligible for CSBE or DBE contracts. However, the superseding indictment alleged that Fisk, through the conduct of Maxwell and his co-conspirators, obtained funds set aside for CSBE and DBE electrical contractors by representing to the County and the United States that a CSBE or DBE was completing the work and receiving the payments on the CSBE or DBE contract

_____

[3] The DBE program is a federal program codified in 49 C.F.R. § 26. A DBE is a for-profit small business that is at least fifty-one percent owned by one or more socially and economically disadvantaged individuals, and whose management and daily business operations are controlled by at least one of those individuals. Id. at § 26.5. A DBE must be certified by the state in which it operates and must perform a commercially useful function.

when, in fact, Fisk was doing the work and the CSBE or DBE was passing the payments on to Fisk.

Of the six MIA contracts, three involved the North Terminal (Contracts 737A, 737G, and 739F), two involved the South Terminal (Contracts B313A and B315A), and one involved the improvement of airport-wide security (Contract F034F). The five contracts involving the North and South Terminals were funded by the County and required compliance with the CSBE program. The sixth contract was federally financed, thus requiring compliance with the DBE program. To be eligible for the non-CSBE or non-DBE portion of several of these electrical contracts, Fisk had to submit, as part of its bid package, a "Letter of Intent" and "Schedule of Participation" identifying the CSBE or DBE subcontractor and specifying the percentage of the job that subcontractor would perform. Once the bid is awarded, compliance with the CSBE program is monitored through the submission of Monthly Utilization Reports ("MURs")[4] that certify the type and quantity of work being performed by the CSBE. The County also performs random audits of the CSBEs to ensure they are performing a commercially useful

_____

[4] A MUR is "a report completed by the successful bidder on a contract that is set-aside" as a CSBE contract. It is "submitted monthly, listing all work performed in the past month by the CSBE identified on the Schedule of Participation and all expenditures paid to date to the identified CSBE." Administrative Order 3-22, as amended.

function. Similarly, the Miami-Dade Aviation Department's Office of Minority Affairs monitors all federally-funded contracts to ensure compliance with the DBE program.

At trial, the Government presented evidence that, through Maxwell's efforts, Fisk was able to obtain contracts at MIA and the funds generated by them, based on a series of false claims that a qualified CSBE or DBE was performing a commercially useful function, when, in truth and in fact, the CSBE or DBE would do little or no work on the contracts. Instead, Fisk would complete the CSBE or DBE portion of the contract, and the CSBE or DBE would turn over its payments from the County or the United States to Fisk.

Maxwell's co-conspirators in this scheme were Norman "Pat" Clyne and Hector Paultre. Clyne was the operations manager at Fisk, having had previously worked for Maxwell at another electrical contractor in Miami. He became employed at Fisk when Maxwell opened the firm's office in January 1998 and Maxwell was his direct supervisor. Clyne described Maxwell as a "micro manager" who wanted to know everything that happened in the office, received copies of all correspondence, regularly visited job sites, and had weekly meetings with project managers.

Paultre was a former Fisk purchasing agent and material expediter who was

introduced to Clyne by Maxwell in 1998 as the owner of FLP Enterprises ("FLP"). Maxwell told Clyne that certified CSBE and DBE electrical contractor FLP "was going to be our small business and disadvantaged partner as [Fisk] started to bid for future work." All licensed electrical contractors are required to designate a "qualifier" who holds the license, signs the permits, and is responsible for the work and the financial status of the company. Because Paultre was not a licensed electrician, FLP's qualifier was always a Fisk employee. Eventually, Maxwell tapped Michael Malone, his relation by marriage, to be FLP's qualifier and Paultre's business partner.

Maxwell and his co-conspirators fraudulently induced the award of the six MIA contracts to Fisk and FLP by falsely representing in their bids that FLP would perform a commercially useful function on those contracts as the required CSBE or DBE. When Clyne prepared Fisk's bids for these contracts, he included a percentage of the work that would be performed by FLP, but he never conferred with FLP about the scope or cost of the job. Clyne was able to do this because Paultre, on behalf of FLP, had pre-signed blank Letters of Intent for Fisk employees to fill out as needed to complete the bids.

Maxwell, Clyne, and Paultre agreed that Fisk would pay FLP a fee equal to either three or five percent of the value of the CSBE or DBE portion of the

contract; the rest of the payments made under the CSBE or DBE portion of the contract would be passed on to Fisk. Later, when Maxwell learned that Paultre had complained that FLP was not making any money on the MIA contracts, he told his project manager "to tell that son of a bitch that he was getting his five percent and just do what he was told." Once these contracts were awarded, Maxwell and his co-conspirators created the illusion that FLP was performing a commercially useful function when, in fact, Fisk performed virtually all of the work on the contracts. They also took measures to conceal this fraud from County auditors.

Contract 737A, in particular, called for the relocation of underground utilities in the North Terminal. The primary contractor was Central Florida Equipment Rental of Dade County ("Central Florida"), which, in turn, hired subcontractors to comply with the CSBE program. When the initial CSBE electrical subcontractor left the job, FLP was awarded the job after submitting to the County a Letter of Intent certifying that it would perform the CSBE-designated work on the contract. However, at Maxwell's direction, Fisk performed the CSBE work on Contract 737A. Specifically, Maxwell directed Clyne to open a job number within Fisk's accounting system for the contract and to obtain the permit. Fisk purchased all of the materials and supplied all of the labor, which was

8

supervised by a Fisk foreperson. Neither Paultre nor Malone were involved in supervising or managing the project. When the job was completed, Central Florida paid FLP with a $90,000 check; Paultre, in turn, endorsed the entire check to Fisk and it was deposited in a Fisk bank account. After County auditors asked Paultre to explain why FLP had turned over the entire $90,000 to Fisk, Clyne, Paultre, and Malone, with Maxwell's approval, prepared and submitted to the County falsified back-dated letters between FLP and Fisk to give the appearance that FLP was repaying a loan made by Fisk.

Contract 737G was a three-year project to install the main infrastructure for telephone and switch gear rooms and required fifteen percent of the electrical work to be performed by a CSBE. Contract 739F was earmarked for the installation of interior electrical work and required that nineteen percent of the work be done by a CSBE. Fisk submitted bids on both contracts, representing that the requisite percentages of CSBE work would be subcontracted to FLP. Paultre and Malone were not consulted about FLP's participation in these bids. Fisk was awarded both contracts and it was agreed that Fisk would receive all the proceeds from the CSBE portion of the contract except for a three percent fee that was to be paid to FLP. To create the illusion that FLP actually was working on these job sites, Fisk foremen transferred Fisk employees to FLP's payroll; the fax sent by

9

the Fisk project manager to Maxwell confirming the transfer noted that "we need to show an FLP presence on our projects." Neither Paultre nor Malone were consulted or involved in the employee transfer. After this transfer, the employees continued to earn the same pay, complete the same tasks, were supervised by Fisk foremen, and used Fisk equipment.

Moreover, Fisk, with Maxwell's knowledge, reimbursed FLP for all of its labor costs for the transferred workers. Maxwell also directed that the Fisk trailer on the job site be replaced by an FLP trailer, for which Fisk paid. Notably, neither Paultre nor Malone supervised any workers, attended weekly planning meetings, purchased materials, or otherwise participated in the completion of these two contracts. Indeed, all Malone did was "ma[k]e sure they didn't have any Fisk stickers on their hard-hats and ma[k]e sure they realized they were working for FLP Enterprises and not Fisk Electric."

Generally, Fisk personnel delivered paychecks to the FLP employees. Fisk wrote two-party checks, which listed both Fisk and FLP as payors, to vendors to give the appearance that FLP was purchasing materials; however Clyne and other Fisk employees negotiated, ordered, and paid for all the materials. Finally, and with Maxwell's knowledge, Fisk submitted MURs to the County falsely claiming that FLP completed the requisite CSBE percentage on the two contracts. Indeed, a

Fisk employee told Maxwell and Clyne that he "was concerned with the fact that [he] was filling out [MURs] for our minority participation, but we did not have minority participation on the project at that time." Maxwell told the employee: "it would be taken care of and not to worry about it."

Contract F034F, still another of the relevant contracts, was for the construction of security rooms and the installation of a fiber-optic infrastructure throughout the airport. Because the contract was a federally-funded project, sixteen percent of the work had to be completed by a DBE. Fisk was awarded the electrical portion of the contract after representing in its bid that FLP would perform the required DBE portion of the electrical work. Again, the bid or scope of the project was never discussed with Paultre or Malone; the only discussion was whether to give FLP a two percent or a three percent cut of the DBE contract. Maxwell and Clyne instructed a Fisk employee to "break out a section of the overall contract to give to FLP," preferably one that involved only the purchase of materials and not the performance of labor. That employee expressed concern that Fisk had no subcontract with FLP, but, again, was told not to worry about it.

Fisk then purchased materials in FLP's name; Clyne did all of the negotiations and FLP's only involvement was the appearance of its name on the two-party check used to pay the supplier. Fisk also transferred some of its workers

11

to FLP's payroll and advanced money to FLP to pay those workers; they continued to do the same work they had performed previously as Fisk employees, and they continued to be supervised by Fisk personnel. Maxwell instructed Clyne to make sure that Paultre attended weekly project meetings in order to give the appearance of FLP involvement. Malone attended only one or two of the thirty meetings and visited the job site only a couple of times. Fisk also submitted MURs falsely representing that FLP had performed the DBE required portion of the contract.

Contracts B313A and B315A also required CSBE participation, however, the primary contractor structured the contracts so that Fisk and FLP each had separate subcontracts directly with the primary contractor, as opposed to making Fisk a subcontractor of the primary contractor, and making FLP a subcontractor of Fisk. Although FLP had its own contracts, which required the performance of work different from the work specified in Fisk's contracts, Fisk actually performed the work on all four contracts. Maxwell and Clyne instructed their managers to split the work on the projects between Fisk and FLP even though Fisk would lose money doing this. When Fisk's labor superintendent asked Maxwell "what kind of money Fisk Electric stands to lose," Maxwell replied, "this is what we have to do to stay in business." As FLP's Project Manager, Malone explained that he "basically didn't do anything," because Fisk ran both Fisk's and FLP's contracts.

Malone and Paultre rarely attended construction meetings and did not supervise the workers. Fisk workers and forepeople were transferred to the FLP payroll during the completion of these contracts and Fisk prepared all of the necessary correspondence between FLP and the primary contractor. Fisk also prepared the daily progress reports documenting the work performed by both Fisk and FLP employees and prepared FLP's pay applications. In fact, Fisk project manager Gary Sargent testified, this was the first time in his twenty-nine year career that he had been asked to prepare daily reports, correspondence, and pay applications on behalf of another subcontractor. Paultre also purchased the Fisk van that Fisk and FLP had been using to travel to the job site, and placed FLP stickers on the van again in order to give the appearance of FLP's presence.

As for each of these two contracts, FLP received progress payments directly from the primary contractor. Maxwell believed that any payments FLP received belonged to Fisk, and that FLP was entitled only to its usual three or five percent cut. Once FLP accumulated approximately $1 million in progress payments, Maxwell began asking Clyne daily how they were going to recover the money, voicing concern that Paultre might flee with it to Haiti. Maxwell directed Clyne to inform the primary contractor not to make further payments to FLP until Maxwell could "figure out how to get the extra cash" FLP had been receiving for Fisk's

13

work.  Maxwell and Clyne monitored FLP's cash flow and Maxwell demanded copies of all of the checks issued by the primary contractor to FLP.  Indeed, Maxwell wrote a note to Clyne asking him "where are we on the half million dollars," referring to the progress payments that FLP had accumulated.  Because the County had begun auditing FLP, Fisk devised a scheme to recoup the progress payments by having FLP pay Fisk's invoices on other MIA contracts.  To do this, Clyne, with Maxwell's approval, created and sent false invoices to FLP for payment.  Thus, for example, Clyne asked a supplier to void the invoices it had issued to Fisk and reissue new invoices directing those charges to FLP.  Clyne also altered some invoices himself using white-out to create the illusion that the debts belonged to FLP and not to Fisk.

An Internal Revenue Services Special Agent audited the financial and contractual records admitted into evidence and calculated that FLP was paid a total of $7,974,647 by the County and the United States for its completion of the CSBE and DBE work on the six MIA contracts.

In cross-examining government witness and co-conspirator Clyne, Maxwell attempted to question him about work done by FLP on contracts other than the six MIA contracts.  The additional contracts were not discussed during Clyne's direct examination.  The district court informed Maxwell that he could not cross-

14

examine Clyne on those other contracts, instructing him that "[y]ou need to call Mr. Clyne in your case" if he wanted to discuss them since they fell outside the scope of direct examination. (Oct. 26, 2006 Transcript at 48). The district court explained its ruling this way:

> We have six contracts here. We have a complex system. Let's keep it focused on the charges with the contracts that are in issue. I'm not here to hear anything about what he may have done on any other place. That's not relevant.
> . . . .
> <u>You can call Mr. Clyne in your case if you want to get into other areas as part of your defense.</u>

(<u>Id.</u> at 49) (emphasis added).

At other times during the trial, the defendant attempted to reference agreements other than the six MIA contracts; the district court again explained that Maxwell could explore the larger relationship between FLP and Fisk while presenting his own case, but would not be permitted to address the matter during the cross-examination of the Government witnesses. (Oct. 23, 2006 Transcript at 125).

Maxwell's defense included testimony about local industry standards. In particular, his witnesses said that it was common in the electrical industry for electricians to be shifted between employers on the job site, and for larger companies to mentor and help smaller companies by advancing funds for their

15

labor and supplies. A labor attorney for the Miami chapter of the International Brotherhood of Electrical Workers testified that, pursuant to an unwritten "interpretation" of the collective bargaining agreement, workers could be reassigned from a prime contractor to a CSBE or DBE subcontractor on the same job without requiring that worker to go through the union hall for reassignment.

A general contractor and personal friend of Maxwell also testified that it was "very common" in the construction industry for big contractors to mentor, train, and help smaller businesses, sometimes by advancing funds to pay for labor and material and using two-party checks. He explained that in the performance of work at MIA, where security clearance is a real concern, it was not uncommon for a larger contractor to share employees with a CSBE on the same job. The witness, however, admitted that the CSBE program's goal of training and mentoring would not be advanced by the mentor company merely adding the CSBE's name to two-party checks or having the CSBE act as a labor pool. He also testified that CSBEs and DBEs are supposed to bid on their own jobs, manage and supervise the jobs they perform, order their own materials, submit their own pay applications, and pay their own employees. He concluded that it would not be a "normal practice," and it would not be permissible for a general contractor to pay a fee for the use of a CSBE's certification.

The Government concluded its case by presenting two rebuttal witnesses who owned certified CSBE electrical companies. They testified that they prepared their own bids for County projects; general contractors had never transferred workers to their payrolls; they negotiated and made the purchases of their own materials; their own forepeople and project managers attended construction meetings and supervised their workers; and the CSBEs prepared their own pay applications.

Prior to trial, the district court instructed Maxwell that he could not mention a Pre-Trial Diversion Agreement reached between Fisk and the Government. (Oct. 17, 2006 Transcript at 38; Oct. 18, 2006 Transcript at 101-105). Under the terms of the agreement, Fisk was required to fire Maxwell, discontinue paying for his defense, and aid the Government's prosecution of the defendant by providing information through witnesses, evidence, and testimony. In exchange for this cooperation, Fisk would avoid being prosecuted and could continue participating in County and United States funded contracts.

In prohibiting the discussion of this agreement, the district court explained that the Pre-Trial Diversion Agreement would be relevant for impeachment purposes only if the witness was the attorney who drafted the agreement, the Fisk signatory to the agreement, or the corporation itself. (Oct. 18, 2006 Transcript at

17

101). It continued that the Pre-Trial Diversion Agreement would not be relevant for impeachment purposes of a witness who is merely a Fisk employee, because being an employee does not mean that the witness had any personal, first-hand knowledge of the circumstances surrounding the agreement. (Id.). The district court also explained that the Pre-Trial Diversion Agreement would mislead the jury because Fisk was not a defendant in the case. (Id. at 114).

At the conclusion of the four week trial, the jury convicted Maxwell on twenty-three counts.[5] Thereafter, the district court denied both Maxwell's Motion for Judgment of Acquittal and his Motion for a New Trial, finding that his conviction was supported by sufficient evidence; that the court had not abused its discretion in prohibiting Maxwell from cross-examining the Government's witnesses about CSBE and DBE work done by FLP outside of the six MIA contracts; that there was no abuse of discretion in prohibiting Maxwell from introducing evidence of the Pre-Trial Diversion Agreement; that it did not abuse its discretion in excluding evidence of payments from the County to Fisk and new contracts at MIA awarded to Fisk; that there was not an improper variance between the superseding indictment and the proof at trial; that it did not abuse its discretion in rejecting Maxwell's proposed jury instruction; and, finally, that it

---

[5] The Government had dismissed Count 5 on October 6, 2006.

could discern no prosecutorial misconduct.

B.    The Sentence

In Maxwell's Presentence Investigation Report ("PSI"), he was assigned a base offense level of seven under § 2S1.1(a)(1) of the Sentencing Guidelines. The PSI then applied the Government Benefits Provision of the Application Notes of § 2B1.1 of the Sentencing Guidelines in order to find the appropriate amount of loss in the case, which it found was the entire sum of the CSBE and DBE payments received by FLP from the six MIA contracts. Because that loss amount was in excess of $7 million, Maxwell's offense level was increased by twenty levels. Additionally, the PSI recommended increasing his offense level by two levels pursuant to § 2B1.1(b)(9)(C), because the defendant utilized sophisticated means to effect the fraud, and two additional levels pursuant to § 2S1.1(b)(2)(B), because Maxwell was convicted of violating 18 U.S.C. § 1956. Finally, Maxwell's offense level was enhanced by four levels -- bringing his final offense level to thirty-five -- pursuant to § 3B1.1(a) because of his leadership role.

Maxwell objected to the PSI, arguing that he should not be held accountable for a loss amount greater than $7 million because he was not personally awarded the contracts, he did not benefit from the contracts, and Fisk made only a small profit on the contracts. Alternatively, he argued that no loss was actually incurred

because the contracts were fulfilled in accordance with local practice; no loss existed for restitution purposes because the County and United States received the electrical work called for under the contracts; the CSBE and DBE programs were not Government Benefits programs under the Sentencing Guidelines; and he did not play a leadership role or use sophisticated means.

In pronouncing sentence, the district court noted that the trial testimony showed that FLP had received a total of $7,974,674 in CSBE and DBE funds on the six MIA contracts, and explained that it sought to punish fraud by focusing on the profit obtained by the proponents of the fraud. Thus, the trial court determined that the amount of loss for purposes of calculating Maxwell's offense level under § 2B1.1 was some $474,000. It reached this figure by taking six percent of the total amount of $7,974,674 paid to FLP for the six MIA contracts, which the district court found to be the profit margin earned by Fisk and FLP. This loss amount yielded an offense level increase of fourteen, rather than an increase by twenty levels. Moreover, the district court increased Maxwell's offense level by three for his role in the offense, yielding a total adjusted offense level of twenty-six or a range of sixty-three to seventy-eight months.

After considering Maxwell's mitigation arguments, the 18 U.S.C. § 3553 factors, and the advisory Sentencing Guidelines range, the district court varied

20

three months below the range recommended by the Sentencing Guidelines, imposing a sentence of sixty months of imprisonment, twenty-four months of supervised release, and a $12,500 fine.

This timely appeal followed.

## II.

Maxwell raises three challenges to his conviction and one to the sentence. Specifically, he claims (1) that the district court abused its discretion in prohibiting him from cross-examining Clyne and other prosecution witnesses about the Pre-Trial Diversion Agreement, about Clyne's request for a sentence reduction in light of his cooperation, and about the CSBE or DBE contracts held by FLP other than the six MIA contracts; (2) that the evidence was insufficient to establish a scheme to defraud or the requisite intent; (3) that the district court abused its discretion in rejecting his proposed "good faith" defense jury instructions; and, finally, (4) that the district court clearly erred in calculating the amount of loss under the Sentencing Guidelines.

A.     Limitation of Cross-Examination

We review Maxwell's claim that the district court improperly limited the scope of his cross-examination for a clear abuse of discretion. United States v. Matthews, 168 F.3d 1234, 1244, amended on other grounds, United States v.

Moore, 181 F.3d 1205 (11th Cir. 1999); United States v. Guzman, 167 F.3d 1350, 1352 (11th Cir. 1999) ("A district court has wide discretion to control the cross-examination of witnesses."). While the district court has "discretionary authority to rule on the admissibility of evidence, including the power to limit cross-examination," this discretion is limited by the guarantee of the Sixth Amendment's Confrontation Clause that a criminal defendant has the right to cross-examine prosecutorial witnesses. United States v. Garcia, 13 F.3d 1464, 1468 (11th Cir. 1994). In particular, "[c]ross-examination of a government 'star' witness is important, and a presumption favors free cross-examination on possible bias, motive, ability to perceive and remember, and general character for truthfulness." United States v. Phelps, 733 F.2d 1464, 1472 (11th Cir. 1984) (citation omitted).

However, "the mere fact that [a defendant] sought to explore bias on the part of a prosecution witness does not automatically void the court's ability to limit cross-examination." United States v. Diaz, 26 F.3d 1533, 1540 (11th Cir. 1994). This is so because the defendant "is entitled only to an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defendant might wish." United States v. Baptista-Rodriguez, 17 F.3d 1354, 1366 (11th Cir. 1994) (quoting Kentucky v. Stincer, 482 U.S. 730, 739 (1986)) (quotation marks omitted). Thus, a defendant

22

can only cross-examine a prosecution witness if "the information sought to be elicited [is] relevant." Diaz, 26 F.3d at 1540 (quoting Haber v. Wainwright, 756 F.2d 1520, 1522 (11th Cir. 1985)); see also Phelps, 733 F.3d at 1472 (noting that cross-examination regarding potential bias "must be relevant"). Additionally, "[o]nce there is sufficient cross-examination to satisfy the Sixth Amendment's Confrontation Clause, further questioning is within the district court's discretion," Garcia, 13 F.3d at 1468. And the district court enjoys "wide latitude" to impose "reasonable limits" on cross-examination based on, among other things, "confusion of the issues" and "interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).

Additionally, "the Sixth Amendment does not require unlimited inquiry into the potential bias of a witness." United States v. De Parias, 805 F.2d 1447, 1452 (11th Cir. 1986), overruled on other grounds by United States v. Kaplan, 171 F.3d 1351 (11th Cir. 1999). Thus, "[t]he test for the Confrontation Clause is whether a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." Garcia, 13 F.3d at 1469; Baptista-Rodriguez, 17 F.3d at 1371 ("A defendant's confrontation rights are satisfied when the cross-examination permitted exposes the jury to facts sufficient to evaluate the credibility of the witness and enables

23

defense counsel to establish a record from which he properly can argue why the witness is less than reliable.").  Put another way:

> [A] defendant's sixth amendment rights are not infringed where cross-examination of a prosecution witness is limited by the trial judge, as long as two conditions are met.  First, the jury, through the cross-examination that is permitted, must be exposed to facts sufficient for it to draw inferences relating to the reliability of that witness.  And second, the cross-examination conducted by defense counsel must enable him to make a record from which he could argue why the witness might have been biased.

United States v. Van Dorn, 925 F.2d 1331, 1335 (11th Cir. 1991) (internal citations omitted).  When measured against these broad standards, we are satisfied that the district court acted within its considerable discretion.

First, we need not decide whether Fisk's Pre-Trial Diversion Agreement was in the broadest sense relevant, because, even if it was, the district court did not abuse its discretion in prohibiting its discussion.  Maxwell's cross-examination of the current Fisk employees, particularly Clyne, exposed facts that were more than sufficient to allow the jury to draw inferences about their reliability and to allow Maxwell to fully argue that they were indeed biased.

Thus, for example, during the direct and cross-examination of Clyne, at least the following pertinent information bearing on bias was amply presented by able trial counsel: (1) Clyne is currently a Fisk employee who is receiving a salary

24

and hoped to receive a bonus; (2) Fisk continues to work on electrical contracts throughout the County and elsewhere; (3) Clyne began cooperating with the Government before he was offered a plea agreement; (4) he reached a plea agreement with the Government pursuant to which he plead guilty to mail fraud, wire fraud, and money laundering; (5) in exchange for his plea agreement, he agreed to continue cooperating with the Government; (6) Clyne met with the Government on ten to fifteen occasions in order to discuss his testimony; (7) as a result of his guilty plea, Clyne has been adjudicated a convicted felon; (8) since his conviction, Clyne has been promoted by Fisk to take over Maxwell's job; (9) Clyne was permitted to postpone the surrender date for his sentence of five years of imprisonment; (10) Clyne believed there was a possibility that his sentence would be reduced after Maxwell's trial and he hoped it would be; (11) Clyne was permitted to go on a fishing trip to Canada after his conviction and sentence were entered; and (12) Clyne admitted to previously lying under oath during the execution of the fraudulent scheme at the center of this case. (Oct. 25, 2006 Transcript at 15-20, 183-84, 189, 191-95; Oct. 26, 2006 Transcript at 9-17).

Indeed, the district court offered the following instruction to the jury as Clyne began his testimony:

In this case the government has called Mr. Clyne as a witness, he is

25

named as a defendant in a related case, and the government has entered into a Plea Agreement with Mr. Clyne that provides for the possibility of a lesser sentence than he would otherwise be exposed to . . . . So, while a witness of this kind may be entirely truthful when testifying, you should consider such testimony with more caution than the testimony of other witnesses.

(Oct. 25, 2006 Transcript at 21). This record more than allowed Maxwell to vigorously argue (as he did) that Clyne was biased. In addition, a reduction of a jail sentence in fact offers a more powerful motive to provide testimony favorable to the Government than any potential financial benefit to one's employer would. Similarly, during the examination of Fisk labor supervisor Robert Brown, Fisk general foreman Mario Maresca, and Fisk project manager Pat Nugent, the jury learned that they are all current Fisk employees, and that Brown and Nugent received immunity letters from the Government. (Nov. 2, 2006 Transcript at 43-46, 83; Nov. 6, 2006 Transcript at 186-88; Nov. 7, 2006 Transcript at 25).

Moreover, the Pre-Trial Diversion Agreement between the Government and the corporate entity Fisk did not directly benefit any Fisk employee who served as a witness for the Government. At most, the benefit to the testifying Fisk employees was that their employer would be able to continue to bid on contracts with the County and the United States, and Maxwell offered no suggestion that if Fisk were deprived of the opportunity to work on government contracts that would

26

affect the company's employees. Finally, the court learned during a proffer out of the jury's presence that Clyne actually had no personal knowledge of the Pre-Trial Diversion Agreement or its contents, and, indeed, had pled guilty some six months before the Pre-Trial Diversion Agreement was struck.

On this record, we are satisfied that the Pre-Trial Diversion Agreement was of no palpable impeachment value to Maxwell, and that the district court judge was well within her discretion in prohibiting Maxwell from cross-examining the prosecution witnesses, in general, and Clyne, in particular, about it.

The second evidentiary mistake cited by the defendant is that he should have been permitted to cross-examine Clyne about the observations in Clyne's sentencing brief that he was the Government's "star witness," and that his "cooperation with his own company . . . as well as his cooperation with the government, should be taken into account by this Court in determining an appropriate sentence reduction." The problem with this argument is that, at the time he testified, Clyne had not yet requested a sentence reduction. In fact, Clyne's motion for a sentence reduction was not filed with the district court until after Maxwell had filed his Notice of Appeal in this case. Thus, the contents of the sentencing brief could not have been the subject of cross-examination at trial. We add, again, that Maxwell did vigorously cross-examine Clyne about his plea

agreement, his hopes for a reduced sentence, and the leniency with which the Government had already treated him. On this record, there can be no question that the jury heard ample evidence about Clyne's possible bias and motives for testifying against the defendant.

Third, and finally, Maxwell argues that the district court abused its discretion by prohibiting him from cross-examining Clyne about CSBE and DBE contracts that FPL worked on other than the six MIA contracts at issue. Any CSBE contracts awarded to FLP outside of the six MIA contracts were beyond the scope of Clyne's direct examination, and therefore Maxwell was not entitled to claim as of right the opportunity to raise the issue on cross-examination, as opposed to presenting it in his own case. Fed. R. Evid. 611(b) ("Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness.").

Maxwell argues nevertheless that the district court should have allowed him to cross-examine Clyne about FLP's participation in other CSBE contracts with Fisk, because the Government had attempted to paint FLP as a sham company, not capable of providing a commercially useful function. But, as the district court explained, the focal point of the Government's case-in-chief was on the six MIA contracts and any associated misrepresentations. The Government never argued

28

that FLP was a "front" or "sham" company, nor that it could never perform a commercially useful function. Again, perhaps most importantly, the district court allowed Maxwell to present this evidence in his own case. Indeed, during Clyne's cross-examination, the district court told Maxwell that if he wanted to discuss contracts other than the six MIA contracts, then he "need[ed] to call Mr. Clyne in [his] case." (Oct. 26, 2006 Transcript at 48). Maxwell declined to do so, obviously making the tactical decision not to call Clyne as his own witness.

Finally, we add that even if the district court had erred in limiting Maxwell's cross-examination on any of these grounds, any error would be harmless beyond a reasonable doubt. Todd, 108 F.3d at 1334 (explaining that if the district court does err in limiting cross-examination, then "we must next determine whether the error was harmless beyond a reasonable doubt") (internal quotation marks omitted). We have explained that

> [i]n making this determination, a host of factors are to be considered, including the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

United States v. Lankford, 955 F.2d 1545, 1552 (11th Cir. 1992) (internal quotation marks omitted). Where "the excluded testimony [is] related to the

29

determinative issue of intent, we cannot say that the error was harmless." United States v. Gaskell, 985 F.2d 1056, 1063 (11th Cir. 1993). Here, the excluded evidence did not go directly to Maxwell's criminal intent; in fact, the proffered evidence was, at best, of limited relevance to the case, was cumulative, or otherwise could have been presented at a later stage in the trial.

In short, we can discern no abuse of discretion in the trial court's evidentiary decisions.

## B.    Sufficiency of the Evidence

Whether there is sufficient evidence in the record to support a jury's verdict in a criminal trial is reviewed de novo, taking the evidence in the light most favorable to the Government. United States v. Futrell, 209 F.3d 1286, 1288 (11th Cir. 2000). Accordingly, we are obliged to resolve any conflicts in favor of the Government, draw all reasonable inferences that tend to support the prosecution's case, and assume that the jury made all credibility choices in support of the verdict. United States v. Thompson, 473 F.3d 1137, 1142 (11th Cir. 2006); United States v. Ward, 197 F.3d 1076, 1079 (11th Cir. 1999). Evidence is sufficient to support a conviction if "a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." United States v. Calhoon, 97 F.3d 518, 523 (11th Cir. 1996). In rebutting the Government's evidence, "[i]t is not

enough for a defendant to put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could not have found guilt beyond a reasonable doubt." Thompson, 473 F.3d at 1142. Measured against this standard, we hold that there was sufficient evidence to show that Maxwell actively participated in the scheme to defraud and had the requisite criminal intent.

Maxwell was convicted of twenty-three counts of substantive and conspiratorial criminal conduct primarily based on mail and wire fraud. The elements of mail and wire fraud are: (1) intentional participation in a scheme to defraud, and, (2) the use of the interstate mails or wires in furtherance of that scheme. See United States v. Hasson, 333 F.3d 1264, 1270 and n.7 (11th Cir. 2003); United States v. Ellington, 348 F.3d 984, 990 (11th Cir. 2003). To sustain the related conspiracy convictions the Government was required to prove that Maxwell knew of and willfully joined in the unlawful scheme to defraud; circumstantial evidence can supply proof of knowledge of the scheme. Ellington, 348 F.3d at 989-90.

A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact, calculated to deceive another out of money or property. United States v. Svete, 556 F.3d 1157, 1161, 1169 (11th Cir.

31

2009) (en banc).  A misrepresentation is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision maker to whom it is addressed."  Hasson, 333 F.3d at 1271.

The evidence, taken in a light most favorable to the Government, reveals that Fisk employees, with Maxwell's knowledge and approval, submitted bids and MURs to the County and to the United States that materially and repeatedly misrepresented that FLP performed a commercially useful function on each of the six MIA contracts when in truth it did not.

Maxwell made the following material misrepresentations and undertook the following conduct in support of the misrepresentations.  He directed that Fisk prepare, negotiate, and review bids containing explicit representations that FLP was going to perform the required CSBE and DBE percentage of the work, despite knowing those representations were false.  Indeed, Fisk prepared bids on behalf of FLP without consulting or discussing the bid with FLP, and without regard for whether FLP was able or willing to undertake the work.  Maxwell and FLP entered into an agreement whereby  Fisk would pay FLP only three percent or five percent of the value of the CSBE or DBE portion of the contract and would retain the rest of the payments as compensation for actually completing the work required by the contract.  When Paultre complained that FLP was not making any money on these

32

contracts, it was Maxwell who ordered his project manager "to tell that son of a bitch that he was getting his [five] percent and just do what he was told."

The evidence established that FLP did not perform a "commercially useful function" on any of the six MIA contracts. Notably, Fisk, not FLP, performed and supervised all of the CSBE and DBE work. But, to give the appearance of FLP involvement, Maxwell directed Paultre occasionally to attend weekly progress meetings; Maxwell transferred Fisk employees to FLP's payroll even though those employees continued to be supervised by Fisk's supervisors, earned the same pay, and performed the same tasks while using Fisk equipment; Maxwell reimbursed FLP for all of the labor costs incurred by Fisk employees who were put on FLP's payroll; Maxwell caused an FLP trailer to be placed on certain job sites; and Maxwell used two-party checks with FLP's name to purchase materials for which Fisk negotiated, ordered and paid. Neither Malone nor Paultre, the two heads of FLP, supervised any workers or ordered or paid for any materials on the six MIA contracts.

Maxwell's conduct on Contract 737A is particularly striking. While FLP received the CSBE electrical subcontract on that project, Fisk was not awarded any part of the contract. But, Fisk performed all of the CSBE required work for FLP anyway. It obtained the permits, purchased the materials, supplied the labor,

33

and provided the supervision. Maxwell directed Clyne to open a Fisk job number for the contract and Paultre signed over to Fisk the entire $90,000 payment that FLP had received under the CSBE subcontract. And, when County auditors subsequently asked Paultre to explain why FLP turned over the entire payment to Fisk, Maxwell's co-conspirators, with his knowledge and approval, prepared and submitted falsified back-dated letters between Fisk and FLP in order to give the appearance that FLP was simply repaying a loan to Fisk.

As for Contracts B313A and B315A, Fisk and FLP were awarded separate bids, requiring them to complete separate tasks. However, Fisk performed the work for both companies, despite Maxwell's knowledge that this would cause Fisk to lose money. A Fisk project manager prepared all of the correspondence between FLP and the primary contractor, as well as FLP's daily progress reports, and FLP's pay applications. Indeed, he testified that this was the first and only time in his twenty-nine year career that he had been asked to do this. Because FLP was paid separately by the primary contractor in installments for these two contracts, Maxwell asked Clyne on a daily basis how they were going to recover the money from FLP, and, at one point, directed Clyne to ask the primary contractor not to make any additional payments to FLP until Maxwell could begin recovering the money. In order to deceive County auditors, Fisk altered its

34

invoices to give the appearance that they were billed to FLP and then had FLP use the proceeds of Contracts B313A and B315A to pay Fisk's bills.

Maxwell also directed that the MURs be filled out falsely, representing that FLP was performing a commercially useful function on all six MIA contracts when, in fact, Fisk, and not FLP, was managing, supervising,  and performing the necessary work.  As for Contracts 737G and 730F, a Fisk project manager alerted Maxwell that he "was concerned with the fact that [he] was filling out [MURs] for our minority participation, but we did not have minority participation on the project at the time."  Maxwell simply told him that "it would be taken care of and not to worry about it."

Based on this body of evidence, we think a reasonable jury could find beyond a reasonable doubt that FLP did not perform a "commercially useful function" on the six MIA contracts, and that Maxwell knew FLP would not perform a commercially useful function.  These misrepresentations were material. Without them FLP would not have been awarded the six MIA contracts and would not have been allowed to continue to participate in them.

Maxwell counters that the Government did not present sufficient evidence of a scheme to defraud, because he presented three witnesses who testified that many of the actions undertaken by Fisk and FLP were consistent with local

industry standards. These witnesses claimed, among other things, that the shifting of employees between a CSBE or DBE certified subcontractor and its primary contractor, supplying of supervisors by the primary contractor for the CSBE or DBE subcontractor, purchasing of materials for the CSBE or DBE contractor by the primary contractor, funding of the CSBE or DBE payroll by the primary contractor, and use of two-party checks to purchase materials for CSBE and DBE subcontractors were consistent with local industry practices. The problem with the argument is that the jury was free to disregard the testimony (as it obviously did) and, instead, to credit the contrary evidence presented by the Government's witnesses, including the two it called on rebuttal. Ellington, 348 F.3d at 990-91; United States v. Calderon, 127 F.3d 1314, 1325 (11th Cir. 1997) (stating that credibility determinations are the sole province of the jury).

The Government also presented sufficient evidence to establish that Maxwell possessed the requisite intent to defraud. An intent to defraud may be found when the defendant believed that he could deceive the person to whom he made the material misrepresentation out "of money or property of some value." United States v. Cooper, 132 F.3d 1400, 1405 (11th Cir. 1998); United States v. Pendergraft, 297 F.3d 1198, 1209 (11th Cir. 2002) (explaining that an intent to defraud is not present if the defendant knew that he could not deceive the recipient

of his statements). A jury may infer an intent to defraud from the defendant's conduct. See United States v. Hawkins, 905 F.2d 1489, 1496 (11th Cir. 1990) (explaining that the Government need not produce direct proof of scienter in a fraud case, but, instead, can rely on circumstantial evidence of criminal intent); Ellington, 348 F.3d at 990 (explaining that specific intent to commit mail fraud can be inferred by a jury from the defendant's conduct).

As we have detailed already, the Government presented ample evidence that Maxwell knowingly made material misrepresentations. Maxwell says, however, that the evidence is insufficient, because his witnesses claimed that some of his conduct was consistent with local industry practices. Again, while Maxwell was free to argue that these local practices were consistent with a lack of fraudulent intent, the jury was equally free to reject this testimony.

Maxwell also argues that he did not have an intent to defraud, because he was confused about the meaning of the CSBE and DBE regulations. This argument is unconvincing as well. First, and most importantly, the specific intent required under the mail and wire fraud statutes is the intent to defraud, not the intent to violate a particular statute or regulation. United States v. Paradies, 98 F.3d 1266, 1285 (11th Cir. 1996). What is most relevant is that Maxwell knew that the bids and MURs were submitted to the government falsely claiming that

FLP would actually perform and was performing a certain percentage of the contracted work.

While Maxwell is correct that when "the truth or falsity of a statement centers on an interpretive question of law, the government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law," United States v. Whiteside, 285 F.3d 1345, 1351 (11th Cir. 2002), that maxim is of little help here. In this case, the jury could readily find beyond a reasonable doubt that the statements that FLP would and did perform the CSBE or DBE portion of the six MIA contracts were false even under the plain language of the pertinent regulations. Both the County and federal regulations explicitly say that a CSBE or DBE is required to perform a commercially useful function. Both regulatory schemes define a commercially useful function as being responsible for the execution of the contract and actually performing, managing, and supervising the work involved. And the DBE regulations make clear that a DBE does not perform a commercially useful function if its role is limited to that of an extra participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of DBE participation. 49 C.F.R. § 26.55(c)(2). There is no obvious ambiguity about whether a CSBE or DBE subcontractor performs a commercially

useful function when the job is managed by the primary contractor, the work is performed by the employees of the primary contractor, the primary contractor does all of the negotiations, evaluations, and payments for the necessary materials, and the subcontractor does nothing more than provide a minimal amount of labor and serve as a signatory on two-party checks. In short, no matter how these regulations are read, the jury could conclude that what FLP did was not the performance of a "commercially useful function."

Moreover, Maxwell's conduct on Contract 737A undermines his confusion argument. That bid was awarded only to FLP. Fisk was not given any work under that contract. However, Fisk completed all of the work assigned to FLP, and FLP, in turn, signed over to Fisk its entire payment for the job. Maxwell cannot claim confusion or uncertainty about the regulations when he involved his company in the performance of a contract that was awarded only to FLP.

Finally, Maxwell claims that he did not deprive the County or the United States of money or property, because, in the end, the County and the United States received the electrical work they sought. However, financial loss is not at the core of these mail and wire frauds. Instead, the penal statutes also seek to punish the intent to obtain money or property from a victim by means of fraud and deceit. Regardless of the quality or cost of the work completed by FLP and Fisk, the

39

money used to pay FLP under those contracts was set aside by the County and the national sovereign to pay only CSBE and DBE electrical subcontractors that were actually performing commercially useful functions. Fisk is not a CSBE or DBE certified company and FLP did not perform a commercially useful function. But, through Maxwell's scheme, FLP obtained construction contracts and substantial payments from the County and the United States for which it was not eligible. By orchestrating an elaborate scheme passing on the CSBE and DBE payments to Fisk, Maxwell defrauded both sovereigns. The County and the United States were free to prescribe the rules of this contracting process, and the defendant was not free to dishonestly circumvent the worthy purpose of the set-aside programs.

C.     Proposed Jury Instruction

We review the district court's refusal to give a proposed jury instruction for abuse of discretion. United States v. Ndiaye, 434 F.3d 1270, 1280 (11th Cir. 2006). In general,

> a refusal to give a requested instruction is an abuse of discretion if: (1) the instruction is correct; (2) the court did not address the substance of the instruction in its charge; and (3) the failure to give the instruction seriously impaired the defendant's ability to present an effective defense.

United States v. Sirang, 70 F.3d 588, 593 (11th Cir. 1995). The district court did not abuse its discretion in denying Maxwell's proposed jury instructions on his

"good faith" defense.

The district court rejected three versions of Maxwell's proposed instructions, explaining that "the issue here is not the interpretation of the regulations," but is, instead,

> whether or not the government has proven that the defendant knowingly and intentionally knew the way that the CSBE operated and the DBE program operated, and notwithstanding that knowledge decided to circumvent that program by submitting what appeared to be a participation on six contracts by a minority business in which the minority business would not be doing the work, but Fisk would be doing the work, and thus attempting to obtain the contract without fulfilling the obligation of the small business doing what it was supposed to be doing under the program.

(Nov. 9, 2006 Transcript at 96).

Maxwell's first proposed instruction said:

> Under the law, a course of conduct is not "fraudulent" if reasonable persons can disagree on regulatory requirements which govern the conduct charged in the Indictment. You should consider the complexities of the county ordinances and federal regulations and any ambiguities contained therein to determine whether the Government established, beyond a reasonable doubt, the charges in the Indictment. A Defendant does not "knowingly" engage in a scheme to defraud when their conduct is consistent with a reasonable interpretation of ambiguous regulatory guidance.

His second proposed instruction stated:

> Where, as in this case, the truth or falsity of a statement, centers upon an interpretive question of law regarding county ordinances, federal regulations, administrative rulings or statutes, the government bears the

41

burden of proving beyond a reasonable doubt that the defendant's statement is not true under a <u>reasonable</u> interpretation of the federal regulations, administrative rulings or statutes. If competing interpretations <u>are reasonable</u>, the Defendant cannot be convicted.

His third proposed instruction read this way:

To demonstrate that the Defendant's claims, statements or pattern of conduct is "known to be false," the Government must demonstrate that there were "lies" and not merely regulatory or technical disputes. Proof of one's mistakes or inabilities is not evidence that one engaged in a scheme to defraud. A Defendant does not "knowingly engage in a scheme to defraud" or engage in a pattern of conduct "known to be false" when his or her conduct is consistent with a reasonable interpretation of ambiguous regulatory guidance.

Instead of reading one of these three proffered instructions to the jury, the district court gave two other instructions about Maxwell's good faith defense. First, the district court told the jury that Maxwell had asserted a good faith defense; that good faith is a complete defense to the charges because good faith is "inconsistent with intent to defraud or willfulness"; that one who expresses an <u>honestly</u> held opinion or an <u>honestly</u> formed belief is not chargeable with fraudulent intent, even if the opinion is erroneous or the belief is mistaken; and that evidence establishing that a person made a "mistake in judgment or an error in management, or was careless, does not establish fraudulent intent."

Second, the district court placed Maxwell's good faith defense in the context of the CSBE and DBE regulations and ordinances by instructing the jury

42

that

> [i]t is the defendant's theory of defense that the defendant reasonably believed that its actions were taken in good faith based upon his experience and understanding of these regulations, the ordinance and the administrative order and common industry practice, and that he had no intent to defraud.
>
> You may consider the regulations, ordinance, administrative order, along with all other evidence, in determining whether the government has proved beyond a reasonable doubt that the defendant acted with specific intent to defraud as charged.

(Nov. 13, 2006 Transcript at 32). As for specific intent, the district court instructed the jury that "[t]o act with 'intent to defraud' means to act knowingly and with the specific intent to deceive or cheat someone ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to oneself." (Id. at 15, 18).

The failure to give any of the alternative versions did not seriously impair Maxwell's ability to defend himself. The district court properly instructed the jury that Maxwell was not charged with violating the CSBE or DBE regulations, correctly explained the elements of conspiracy, mail fraud, wire fraud, and money laundering, explained that Maxwell must have specifically intended to deceive the sovereigns out of money or property, and put the burden on the Government to prove each element beyond a reasonable doubt. The instructions were sufficient to

enable Maxwell to argue in closing that he lacked the requisite criminal intent. See United States v. Silverman, 745 F.2d 1386, 1395-96 (11th Cir. 1984) ("A district judge is vested with broad discretion in formulating his charge to the jury so long as it accurately reflects the law and the facts. The charge must define the offense charged and its elements to enable the jury to apply the law to the facts.") (citations omitted).

Furthermore, Maxwell's proposed jury instructions contain partisan and argumentative statements of law and fact, and the district court was not obliged to present them to the jury in that form. See Paradies, 98 F.3d at 1287 (explaining that the district court does not have to give a requested jury instruction that is "partisan and that . . . aspired to place the . . . defendants' desired factual findings into the mouth of the court") (quotation marks omitted); United States v. Barham, 595 F.2d 231, 245 (5th Cir. 1979) (affirming the district court's failure to give a "theory of the defense" jury instruction when "the requested instruction was more in the nature of a jury argument than a charge").[6]

D.     Amount of Loss Calculation

We review a district court's interpretation of the Sentencing Guidelines

---

[6] The Eleventh Circuit has adopted as precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981, and all Fifth Circuit Unit B decisions rendered after October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981).

44

<u>de novo</u>, and the determination of the amount of loss involved in the offense for clear error. <u>United States v. Woodard</u>, 459 F.3d 1078, 1087 (11th Cir. 2006). Clear error will be found only if the court is "left with a definite and firm conviction that a mistake has been committed." <u>United States v. Crawford</u>, 407 F.3d 1174, 1177 (11th Cir. 2005) (citation omitted).

Maxwell challenges the district court's calculation of the loss amount used to determine his total offense level under § 2B1.1 of the Sentencing Guidelines. The Government requested a loss amount of $7,974,674, representing the total amount of CSBE and DBE funds awarded to FLP under the six MIA contracts. The district court, however, determined that the appropriate loss amount was only $474,000, a calculation that represented only six percent of the $7,974,674 actually paid on those contracts. The district court reasoned that value was the appropriate amount of loss after hearing testimony that six percent fell within the average profit margin made by electrical subcontractors on such government contracts. Specifically, the district court explained that the six percent profit margin was appropriate because:

> it also seems to be a reasonable estimate, because if I look at, even taking the low end of the gross profit that the testimony numbers came up, which was [three] percent, there was also the [three] to [five] percent that was paid to Mr. Paultre. I am sure that was not part of the stated loss. It was built somewhere into the contract. And so if you take the

45

[three] percent for the stated loss, plus another [three] percent that was hidden in there, that would come up to [six] percent. So based on the testimony and just simple logic, this was not done to simply operate as a pass-through. So taking [six] percent loss of the 7.9 [million] just is right over [fourteen] – I mean it is 400-something; $474,000 in loss, approximately.

(Mar. 12, 2007 Transcript at 67-68). Thus, the district court concluded that the loss in the case merited a fourteen level enhancement under § 2B1.1(b)(1)(H) of the Sentencing Guidelines.

Section 2B1.1 provides the base offense level for defendants convicted of crimes involving fraud and deceit, and various increases in the offense level depending on the amount of money at issue.[7] In determining the loss attributable to relevant conduct, the Government bears the burden of proving loss with reliable and specific evidence. See United States v. Dabbs, 134 F.3d 1071, 1081 (11th Cir. 1998) (interpreting § 2F1.1, which was consolidated with § 2B1.1 on November 1, 2001).[8] The Sentencing Guidelines define actual loss as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt.

---

[7] Specifically, § 2S1.1(a) incorporates § 2B1.1 to determine a defendant's offense level according to the attributable loss amount.

[8] Much of the case law on this issue was created using pre-2001 Sentencing Guidelines. However, the consolidation of § 2B1.1 and § 2F1.1 did not materially alter the provisions pertinent to this analysis. See United States v. Gupta, 463 F.3d 1182, 1199 (11th Cir. 2006) (noting that § 2F1.1 was deleted by its consolidation with § 2B1.1 in 2001 and "there is no identifiable difference in our analysis based upon the consolidation").

46

n.3(A)(i).[9]  Pecuniary harm "means harm that is monetary or that otherwise is readily measurable in money."  Id. at cmt. n.3(A)(iii).  If a loss cannot be reasonably determined, the Guidelines instruct the courts to "use the gain that resulted from the offense as an alternative measure of loss."  Id. cmt. n.3(B) (emphasis added).

However, § 2B1.1 also contains a specific provision that addresses how loss is to be calculated when the fraud or deceit involves a Government Benefits program.  It reads this way:

> In a case involving government benefits (e.g., grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be.

U.S.S.G. § 2B1.1 cmt. n.3(F)(ii).

At least two of our sister circuits have held that the DBE program or a similarly structured municipal program are Government Benefits programs for purposes of § 2B1.1.  See United States v. Leahy, 464 F.3d 773, 790 (7th Cir. 2006) (holding a city minority contracting program was a Government Benefits program under § 2F1.1 before it was consolidated with § 2B1.1);  United States v.

---

[9] The commentary and application notes of the Sentencing Guidelines are authoritative, unless they are plainly erroneous, inconsistent with the regulation they interpret, or contrary to the Constitution or federal law.  Stinson v. United States, 508 U.S. 36, 45 (1993); United States v. Torrealba, 339 F.3d 1238, 1242 (11th Cir. 2003).

47

Bros. Constr. Co. of Ohio, 219 F.3d 300, 317-18 (4th Cir. 2000) (holding the fraudulent receipt of DBE funds involved the diversion of Government Benefits under the Sentencing Guidelines); see also United States v. Tulio, 263 Fed. Appx. 258, 263 (3d Cir. 2008) (holding Government Benefits provision of § 2B1.1 applies to DBE funded contracts). This is so, because DBE and similar programs are "affirmative action program[s] aimed at giving exclusive opportunities to certain women and minority businesses," thus making them entitlement program payments. Leahy, 464 F.3d at 790; Bros. Constr. Co. of Ohio, 219 F.3d at 317-18; see also  Adarand Constructors, Inc. v. Slater, 528 U.S. 216, 217 (2000) ("Congress has adopted a policy that favors contracting with small businesses owned and controlled by the socially and economically disadvantaged.").

In fact, evidence was presented at Maxwell's trial that the primary purpose of the CSBE and DBE programs is to help small minority-owned businesses develop and grow, creating new jobs and helping to overcome the effects of past discrimination in the construction industry. Unlike standard construction contracts, these contracts focus mainly on who is doing the work. We are persuaded by the well-reasoned opinions of our sister circuits and conclude that both the CSBE and DBE programs are Government Benefits Programs under § 2B1.1 of the Sentencing Guidelines. Thus,  the appropriate amount of loss here

should have been the entire value of the CSBE and DBE contracts that were diverted to the unintended recipient.

The entire CSBE and DBE portions of the six MIA contracts were diverted to unintended recipients, FLP and Fisk. It is of no moment that FLP was a certified CSBE and DBE contractor; what matters is that FLP did not provide a commercially useful function on any of them. The proceeds of the six MIA contracts should have, but did not, go to a certified CSBE or DBE contractor that completed a commercially useful function.

However, because the Government has not cross-appealed on this issue, a remand to increase the amount of loss applicable to Maxwell's Sentencing Guidelines calculation is unwarranted. Rather, on this procedural posture, we are called upon only to determine whether the district court clearly erred in determining that Maxwell's loss amount was not zero. But, because we believe the Government Benefits provision of § 2B1.1 applies here, the proper calculation of loss should have been $7,974,674. It follows then that we cannot find clear error in the determination that Maxwell's loss amount was only $474,000.

We add that the district court's calculation was not clearly erroneous under the law of this Circuit at the time it was made. We have never before addressed whether the CSBE and DBE programs are Government Benefits Programs under §

49

2B1.1.  In <u>Gupta</u>, we stated, in making an amount of loss calculation in a fraud case that did  not involve a Government Benefits Program under § 2F1.1, that "[f]raud is conjured in numerous variations and that should be considered when choosing a calculation methodology for the harm intended or caused."  463 F.3d at 1199.  To that end, we explained that this Court has used differing methods to calculate the amount of loss depending on the nature of the fraud.  <u>Id.</u> at 1200. In particular, we noted that two "more commonly used forms of calculation" for the loss amount are "(1) the loss to the losing victims method; and (2) the defendant's gain or net gain method."  <u>Id.</u> (quotation marks omitted).

The district court used the "defendant's net gain method" in making a loss calculation.  There is no clear error in finding that the net profit was $474,000. The record amply supports the conclusion that $7,974,647 was improperly awarded to FLP on the six MIA contracts and that a profit margin of six percent was likely earned on those contracts.

In short, we AFFIRM both the convictions and sentence of Maxwell in all respects.

**AFFIRMED**.