[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-13435

_____

D.C. Docket No. 1:10-cr-20430-JLK-2


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

CONSTANCE POWELL,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(February 20, 2013)

Before TJOFLAT, MARTIN and FAY, Circuit Judges.

PER CURIAM:

Constance Powell was convicted of conspiracy to commit mail and wire

fraud, in violation of 18 U.S.C. § 1349 (Count 1), as well as three counts of mail

fraud, in violation of 18 U.S.C. § 1341 (Counts 2-4), in connection with a

mortgage fraud scheme. She was sentenced to 108 months of incarceration and five years of supervised release. She was also ordered to pay $843,402.94 in restitution and $400.00 in special assessments. On appeal, Powell raises three issues: (1) whether there is sufficient evidence in the record to support her convictions; (2) whether the district court abused its discretion in granting the government's motion in limine, thereby preventing the development of a defense theory; and (3) whether the district court erred in adopting a calculation of the mortgage fraud loss amount based upon the lenders' losses without evidence in the record that such losses were occasioned by fraud. After studying the briefs, hearing oral argument, and reviewing the record, we affirm Powell's convictions and sentence.

## I.    FACTS

A. The Scheme

Powell and her associate in the real estate industry, Yolette Antoine, were indicted as participants and co-conspirators in a mortgage fraud scheme. From about June 2004 through April 2007, Powell and Antoine induced various lenders to fund fraudulent mortgages by supplying them with false loan applications. The base of operations for this scheme was located at 3800 Inverrary Boulevard, Lauderhill, Florida, which served as the business location for the following

enterprises: Apex Mortgage, operated by Powell as branch manager;[1] Secure Real Estate Investments,[2] owned and operated by Powell; Horizon Financial Corporation, owned by Secure Real Estate Investments and operated by Powell; and First Continental Mortgage, owned and operated by Powell. Powell's ownership and/or operation of each of these business entities was exclusive. Powell established separate bank accounts, on which she was the sole signatory, for each of these entities, with the exception of Apex Mortgage.

Each of the real estate transactions supporting Powell's convictions followed the same general pattern: Antoine[3] would obtain the personal identifying information, such as a driver's license and social security number, of someone to serve as a straw buyer. Sometimes a straw buyer was paid to participate in the scheme,[4] while other times a straw buyer was duped.[5] In every case, however, the straw buyer's personal identifying information was used without her knowledge of or consent to the actual transactions.

---

[1] Powell's relationship with Apex Mortgage began December 7, 2004, when she executed her employment contract, and ended in the first quarter of 2006, when she was terminated after an investigation revealed that no payments had been made on two loans that Powell originated.

[2] This enterprise included Secure Real Estate Investments, doing business as Sweet Productions.

[3] On occasion, Antoine was assisted by her business partner, Daniel Morisma.

[4] For example, Anne Gaspard was promised $5,000, but paid only $2,500, for signing an application for a government loan program offered to persons granted asylum, or so she was led to believe.

[5] For example, Denise Madriz was told she was buying an acre of unimproved land in Macon, Georgia for $5,000 when, in fact, she was buying a home in Estero, Florida for $500,000.

3

In the next step of their scheme, Powell and Antoine would identify a property available for their straw buyer to purchase.  Once the property was under contract, Powell would complete a Uniform Residential Mortgage Application (Form 1003) in the name of the straw buyer, using fabricated employment information and inflated values for the straw buyer's income, assets, account balances and the like.  Powell would then sign the false loan application in her own name, as the mortgage broker, and submit it to a lender.  The lender relied upon the loan application and supporting documents, such as an employment verification and account statements, also of Powell's invention, in making its commitment to fund the fraudulent mortgage.  Finally, most transactions were concluded by an "out-of-office closing by mail" or a "mail-in closing," in which the straw buyer need not be physically present in the law office or title company.  Thus, the straw buyer's true role in the transaction was known only to the conspirators.

For their efforts, Antoine typically received a "finder's fee" for each straw buyer, while Powell received a mortgage broker's commission and, at times, also received a realtor's commission and even the seller's proceeds by "flipping" (or reselling at a higher price) a property to a succession of straw buyers.  At other times, Powell or Antoine created quit-claim deeds transferring title of a property from the straw buyer to themselves, while leaving the straw buyer's name on the mortgage.  Powell's ability to profit from each step of the scheme was greatly

4

facilitated by her ownership and control of her related companies at 3800 Inverrary Boulevard, as detailed below.

## B. The Motion In Limine

Prior to trial, the government filed a motion in limine seeking to bar Powell from referring to (1) the mortgage lenders' negligence and/or failure to investigate further any issues with the mortgage applications originated by Powell; (2) the present foreclosure crisis and the role of the mortgage lenders in any ongoing foreclosure actions; and (3) any government action managing the foreclosure crisis. In support of its motion, the government argued that the role, if any, played by the lenders at the time of the fraud is irrelevant to the determination of whether Powell committed the alleged offenses. Powell opposed the government's motion, arguing that such evidence is admissible because it may rebut the conclusion that the lenders were defrauded, and may tend to prove that any loss suffered by the lenders could have been avoided if they followed both the law and their own underwriting rules.

The district court granted the government's motion, holding that evidence of the negligence or bad conduct of the lenders, the present foreclosure crisis, and the role of the lenders and the government in managing the foreclosure crisis is irrelevant and immaterial.

## C. The Sentencing

Upon Powell's conviction, a probation officer prepared a presentence investigation report ("PSI") in accordance with the United States Sentencing Commission Guidelines Manual.  Based upon a mortgage fraud loss amount greater than $1 million, but less than $2.5 million, the probation officer initially assessed a 16-level increase in Powell's offense level, pursuant to U.S.S.G. § 2B1.1(b)(1)(I).  In its objection to the PSI, the government advocated an 18-level increase in Powell's offense level based upon a loss amount of approximately $5.3 million, pursuant to U.S.S.G. § 2B1.1(b)(1)(J).  The government reached this higher loss amount by including in its calculation lenders' losses resulting from Powell's relevant conduct, which encompasses all of Powell's acts and omissions "that were part of the same course of conduct or common scheme or plan as the offense of conviction."  U.S.S.G. § 1B1.3(a)(2).  In her response, Powell objected to the inclusion of this relevant conduct in the government's calculation on the grounds that there is no evidence in the record that such losses were occasioned by fraud.

At the sentencing hearing, the government called Neptine Diejuste, a Florida Financial Crimes Investigator, who examined 20 of Powell's real estate transactions, involving 17 different properties, during the period of the conspiracy.  In his investigation, Diejuste reviewed the title files, mortgage lenders' files, property records, foreclosure sale records, and Powell's bank records, as well as

6

interviewed witnesses or reviewed witness interviews, with respect to all 20 transactions. Diejuste's evidence established the following: Three properties were used in multiple transactions. Five persons were used as straw buyers and/or sellers in 11 transactions. Powell brokered 17 of the transactions, receiving an approximate total of $295,000 in commissions. Powell or a company related to her received an approximate total of $822,000 in seller's proceeds through nine transactions. Powell's common purpose and similar modus operandi were described in each of the 20 transactions. Finally, the mortgage lenders' losses, in the aggregate, were approximately $5.3 million.

Powell argued that the government's loan loss calculation should not include any real estate transactions outside the scope of the trial because such transactions do not constitute relevant conduct. Specifically, Powell asserted that there is no record evidence to establish that the loan losses from such transactions were occasioned by fraud, much less Powell's fraud. The district court disagreed, adopting the government's calculation and imposing an 18-level increase in Powell's offense level based on a loss amount of approximately $5.3 million.

## II.    STANDARDS OF REVIEW

Several standards of review govern this appeal. We review the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor

of the jury's verdict. *United States v. Taylor*, 480 F.3d 1025, 1026 (11th Cir. 2007) (citation omitted). Evidence is sufficient to support a conviction if a reasonable trier of fact could find guilt beyond a reasonable doubt. *United States v. Jiminez*, 564 F.3d 1280, 1284-85 (11th Cir. 2009) (citation omitted). In order for the defendant to prevail, she must show that the jury could not have found guilt under any reasonable construction of the evidence. *United States v. Chastain*, 198 F.3d 1338, 1351 (11th Cir. 1999) (citation omitted).

We review a district court's evidentiary rulings for abuse of discretion. *United States v. Perez-Oliveros*, 479 F.3d 779, 783 (11th Cir. 2007) (citation omitted). Whether the exclusion of evidence violated a constitutional guarantee is reviewed *de novo*. *United States v. Sarras*, 575 F.3d 1191, 1209 n.24 (11th Cir. 2009) (citation omitted).

We review a district court's consideration of the United States Sentencing Guidelines for clear error as to factual findings and *de novo* as to questions of law. *United States v. Knight*, 562 F.3d 1314, 1322 (11th Cir. 2009) (citation omitted). In calculating loss under the Guidelines, the district court retains broad discretion and may rely on all relevant conduct, including uncharged conduct, that the government proves by a preponderance of the evidence. *See United States v. Hamaker*, 455 F.3d 1316, 1336-38 (11th Cir. 2006) (considering U.S.S.G. §

8

2F1.1); *see also United States v. Foley*, 508 F.3d 627, 632-33 (11th Cir. 2007)

(applying *Hamaker* to a loss calculation under U.S.S.G. § 2B1.1).

### III.    DISCUSSION

A.  The Scheme

To establish guilt of mail fraud, in violation of 18 U.S.C. § 1341, as charged

in Counts 2-4, the government must prove beyond a reasonable doubt that the

defendant (1) intentionally participated in a scheme or artifice to defraud another

of money or property, and (2) used or caused the use of the mails or wires for the

purpose of executing the scheme or artifice.  *United States v. Maxwell*, 579 F.3d

1282, 1299 (11th Cir. 2009) (citation omitted).  In the instant case, Powell does not

dispute the second element of the offense; she concedes that fraudulent mortgages

were procured with false loan application packages sent to lenders by mail from

her office.  Powell does dispute, however, whether there was sufficient evidence of

her intent to participate in the mortgage fraud scheme to satisfy the first element.

She contends that no reasonable trier of fact could find that she had the requisite

intent to defraud, based on what little evidence the government offered at trial,

because she was oblivious to Antoine's scheme throughout.[6]

---

[6] Antoine pleaded guilty to one count of conspiracy to commit wire and mail fraud, in violation of 18 U.S.C. § 1349, and one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1).

To establish guilt of conspiracy to commit wire and mail fraud, in violation of 18 U.S.C. § 1349, as charged in Count 1, the government must prove that the defendant knew of and willfully agreed to participate in the unlawful scheme to defraud. *Maxwell*, 579 F.3d at 1299 (citation omitted). Again, Powell disputes whether there was sufficient evidence of her knowledge of and willful intent to join Antoine in the scheme. Because secrecy is an essential element of conspiracy, the government may use circumstantial evidence to prove knowledge of the scheme. *United States v. Ellington*, 348 F.3d 984, 989-90 (quoting *United States v. Hernandez*, 921 F.2d 1569, 1575 (11th Cir. 1991)). Furthermore, "[a] jury may infer an intent to defraud from the defendant's conduct." *Maxwell*, 579 F.3d at 1301 (citations omitted). "Evidence that a defendant personally profited from a fraud may provide circumstantial evidence of an intent to participate in that fraud." *United States v. Naranjo*, 634 F.3d 1198, 1207 (11th Cir. 2011) (citation omitted).

Although the indictment contemplates twelve separate properties, the bulk of the government's trial presentation centered on six real estate transactions involving five properties, which we discuss in turn. Considering the overwhelming evidence, there is simply no question of the existence of the mortgage fraud scheme. Consequently, we will focus only on those parts of the record that bear upon Powell's knowledge of and intent to participate in the scheme.

10

The property located at 1111 SW 31 Avenue, Fort Lauderdale, Florida, the subject of Counts 1-4 of the indictment, was involved in two real estate transactions germane to Powell's intent. The first was a sale from Denise Saintil[7] to Anne Gaspard, which closed on or about July 28, 2005. Belkis Camacho, the owner and closing agent for Reliance Title Services, which handled this closing, furnished the following testimony: Camacho personally knew Powell from prior transactions and identified her in court. When dealing with Powell's related companies—Apex Mortgage, Horizon Financial, Secure Real Estate, Sweet Productions—Camacho always dealt only with Powell. In this particular transaction, Powell received $2,757 as the real estate agent[8] and $5,174.95 (through Apex Mortgage) as the mortgage broker. A check for the seller's proceeds of $68,941.88 was made payable to Saintil, but it was later cancelled and another check in the same amount was made payable to Powell's company, Secure Real Estate. This was an out-of-office closing, in which both the buyer's and seller's documents were picked up from and returned to the title company by hand delivery; however, Camacho could not say who handled the actual deliveries.

Regarding her purchase of 1111 SW 31 Avenue, Gaspard testified that she was introduced to Powell by Antoine, who was helping Gaspard apply for a

---

[7] Saintil is Powell's sister.

[8] Powell acted as both the listing agent and the buyer's agent.

11

government loan program offered to persons granted asylum, or so she was told. Gaspard described Powell first as "[a] big girl with a lot of hair, light skinned." A moment later, Gaspard said Powell was a "white person." At their first and only meeting, Gaspard watched Powell write out a check for $2,500, drawn on Horizon Financial's account and made payable to Gaspard.[9] Gaspard was told that the check was the first disbursement of a $5,000 loan for which she qualified. This was the extent of Gaspard's contact with Powell.

The second transaction involving 1111 SW 31 Avenue was a sale from Gaspard to Larry Anderson, which closed on or about April 17, 2007. Karen Mignone, a title processor at Atlantic Coast Title, which handled this closing, testified as follows: As a title processor, Mignone assisted with the preparation of closing documents, but did not conduct actual closings. In preparation for this particular closing, Mignone dealt with Powell's mortgage brokerage, First Continental Mortgage, but did not know Powell personally. First Continental submitted the loan application to the lender on the buyer's behalf and supplied a copy for Mignone's title file. Mignone's file also contained a letter from Powell to the office manager of Atlantic Coast Title,[10] as well as a letter from Gaspard to Atlantic Coast Title requesting that the check for the seller's proceeds be made

---

[9] This check was identified by Gaspard and admitted into evidence.

[10] Powell's letter authorizes Atlantic Coast Title "to take $1,562.83 from our proceeds to cover the difference for the buyer."

12

payable to Sweet Productions.  At closing, Powell received a broker's commission (through First Continental) of $10,928.14 and the seller's proceeds (through Sweet Productions) of $58,361.88.  This, too, was an out-of-office closing, so Mignone was unable to personally verify the identities of the buyer, seller, or mortgage broker.

Regarding his purchase of 1111 SW 31 Avenue, Anderson testified that he was introduced to Powell by his girlfriend, Tracy Longshaw, who is Powell's cousin.  Powell offered to pay Anderson $10,000 in exchange for his permission to use his personal identifying information to purchase a Florida property.  Powell assured Anderson that the proposed transaction was legal and that he would not have to pay the mortgages.  Anderson complied by sending a facsimile of his driver's license to Powell, but he never received the promised payment.  This was the extent of Anderson's involvement in the transaction.

Reliance Title Services conducted two other closings that involved Powell.  The first, the subject of Count 2 of the indictment, was the purchase of the property located at 18681 SW 41 Street, Miramar, Florida by Marienne Cavalier and Louise Lorestie on or about June 9, 2005.  Regarding this transaction, Camacho testified that Powell supplied Reliance Title with copies of the sale contract, the loan application, and proof of insurance.  For her services as mortgage broker, Powell received a commission of $15,545.  As this was another out-of-office closing, the

13

buyers did not appear.  Camacho had no record or recollection of who delivered the buyers' documents.

Regarding her purchase of 18681 SW 41 Street, Cavalier testified that it was not her signature next to Powell's signature on the loan application.  Cavalier didn't know the name Constance Powell.  Cavalier only had contact with Antoine, who was a relative of Cavalier's deceased husband.

Camacho also testified regarding the purchase of the property located at 21655 Berwich Run, Estero, Florida by Denise Madriz and Pauline Davis on or about August 8, 2005.  This property was the subject of Count 3 of the indictment. The title file for this transaction contained an intra-office note to Camacho evidencing a call from Powell regarding the new sale contract and the buyers' general information.  The file also contained an escrow letter evidencing a $5,000 deposit held by Powell's company, Horizon Financial.  Once again, Powell was the mortgage broker, for which she received a commission of $17,145.

Madriz and Davis were recruited as straw buyers by Antoine, who offered to sell them each an acre in a parcel of land in Macon, Georgia for $5,000 and $7,500, respectively.  Neither Madriz nor Davis knew that the documents Antoine directed them to sign were for the purchase of 21655 Berwich Run.  Neither Madriz nor Davis had ever heard of Constance Powell.

14

Regarding the property located at 24 Lyndenhurst Lane, Palm Coast, Florida, the subject of Count 4 of the indictment, Doramise Moreau testified as follows:  Moreau did not engage in any business with Apex Mortgage.  She was not familiar with Horizon Financial or the address 3800 Inverrary Boulevard in Lauderhill, Florida.  She did not know any woman by the name of Constance Powell.  She could not recognize Powell's signature.  Finally, she had never seen the stack of loan documents, shown to her at trial, bearing her name and the address of the property she purchased, 24 Lyndenhurst Lane.  However, those loan documents all bear the name and/or signature of Constance Powell as mortgage broker.

The government's case also included the testimony of two mortgage industry professionals.  The first, Roy Williams, was the owner and CEO of Apex Financial Group, Inc., doing business as Apex Mortgage.  According to his testimony, Powell entered into an employment contract with Apex Financial Group, whereby she agreed to abide by certain mortgage brokering procedures as a condition of her employment as an Apex Mortgage branch manager.  Williams authenticated Powell's signature based upon the many loan applications she signed and submitted through Apex Mortgage.  Under this contract, Powell was bound to submit accurate and truthful information to lenders, a responsibility she could not

15

delegate.  Powell was the only person in her branch with the authority to sign and submit loan applications.

The second mortgage industry professional to testify was William Satchwell, the NetBank underwriter for the mortgages given to Anne Gaspard for the purchase of 1111 SW 31 Avenue, and to Marie Compere for the purchase of 46 Ferndale Lane, Palm Coast, Florida, both discussed above.  At trial, Satchwell was qualified as an expert in NetBank's underwriting practices.  Regarding the latter transaction, Satchwell testified that Powell provided NetBank with Compere's loan application and a mortgage brokerage contract, both bearing Powell's signature, as well as a written verification of employment, bank statements and other supporting documents.  Regarding the former transaction, Satchwell testified that Powell submitted Gaspard's loan application package to NetBank electronically, using an underwriting cover sheet that identified Powell as the mortgage broker.  Satchwell admitted, however, that he did not know Powell, nor could he authenticate her signature.

The testimony and exhibits discussed above comprise the bulk of the government's case with respect to Powell's knowledge of and intent to participate in the mortgage fraud scheme.  The existence of the fraud itself is beyond dispute: All of the loan application packages in evidence, including the employment verifications, bank statements and other supporting documents, were false, and all

16

of them were submitted by someone in Powell's office. Powell concedes this. The crux of Powell's argument on appeal is that the evidence is not sufficient to prove her participation in the preparation and mailing of the fraudulent loan applications. We disagree.

Preliminarily, we note that it is not necessary that Powell actually do any of the mailing, as long as there is sufficient evidence to tie her to this scheme involving the use of the mails. *See United States v. Ward*, 486 F.3d 1212, 1223 (11th Cir. 2007) (citation omitted). Anderson testified that Powell met with him and promised him money to act as a straw buyer. Gaspard testified that Powell met with her and paid her with a check, drawn on Horizon Financial's account, in exchange for signing what Gaspard thought was an application for public assistance, as opposed to a mortgage application. It is immaterial to our inquiry whether only two of the government's witnesses directly observed Powell's participation in the scheme, or that Gaspard's testimony was ostensibly inconsistent. The jury is free to credit or disregard a witness' testimony. *Maxwell*, 579 F.3d at 1301 (citations omitted). This direct evidence, by itself, is sufficient to support the jury's verdict.

The circumstantial evidence of Powell's conduct of and enrichment by the scheme also points to her knowing and willful participation. Most of the victims of the scheme could not say they knew Powell, even though she was their mortgage

17

broker, because Powell employed Antoine to distance herself from the straw buyers. Powell relied upon out-of-office closings to further conceal her use of straw buyers in these transactions. And Powell used her related business entities in order to hide the many roles she played in these transactions, as well as to reap realtor's commissions, mortgage broker's commissions and sellers' proceeds. As Camacho testified, she personally knew Powell and, when dealing with her related business entities, always dealt only with Powell. As Williams testified, Powell was legally bound to submit truthful loan applications, which only she could sign. Williams also authenticated Powell's signature for the jurors, allowing them to compare it to all of her other signatures in the fraudulent loan packages. This circumstantial evidence, by itself, is also sufficient to support Powell's convictions.

This Court finds the government's evidence more than sufficient to prove Powell's knowledge of and intent to participate in the mortgage fraud scheme. Accordingly, we affirm the jury's verdict.

B. The Motion In Limine

Powell contends that the district court abused its discretion in granting the government's motion in limine, thereby preventing the development of a defense theory. Powell's defense, fully developed at trial, was that she had no knowledge of the pervasive falsity in the real estate transactions selected by the government (and therefore no intent to defraud), and that the straw buyers, with few exceptions,

dealt exclusively with Antoine (the real fraudster).  The additional theory Powell wished to present was that her conduct, in the context of industry norms at the time in which she acted, was not consistent with an intent to defraud.  Specifically, Powell sought to show that the lending institutions that were the nominal victims were, in fact, fully informed participants who, motivated by profit, encouraged an environment in which the ability of the borrower to repay the mortgage was treated as immaterial.  In this context, Powell avers, her conduct was no more fraudulent than that of the lenders themselves.

The district court properly excluded evidence of the mortgage lenders' alleged negligence, the present foreclosure crisis, and the respective roles of the lenders and the government in that crisis on the basis of relevance.  In order for evidence to be relevant, it must be probative of the proposition it is offered to prove, and that proposition must be one that is of consequence to the determination of the action.  *United States v. Glasser*, 773 F.2d 1553, 1559 n.4 (11th Cir. 1985) (citations omitted).  Whether the lenders in this case knew or should have known that the loan applications were fraudulent is of no consequence to this action.  It has no bearing on the essential element of Powell's conduct, namely her intent to participate in the mortgage fraud scheme.

Whether the lenders were motivated by profit or did, in fact, profit from Powell's efforts is equally immaterial.  As this Court observed in *Unites States v.*

19

*Svete*, "the government can convict a person for mail or wire fraud even if his targeted victim never encountered the deception – or, if he encountered it, was not deceived." 556 F.3d 1157, 1166 (11th Cir. 2009) (en banc) (quoting *Pelletier v. Zweifel*, 921 F.2d 1465, 1498 (11th Cir. 1991)).

Likewise, whether the lenders negligently created an environment of lax lending standards is irrelevant. Contributory negligence is not a defense to the crime of fraud. "[W]hatever role, if any, a victim's negligence plays as a bar to civil recovery, it makes little sense as a defense under a criminal statute that embraces '*any* scheme or artifice to defraud.' A perpetrator of fraud is no less guilty of fraud because his victim is also guilty of negligence." *Svete*, 556 F.3d at 1165 (citations omitted).

This Court finds that the district court did not abuse its discretion in granting the government's motion in limine. Accordingly, we affirm its decision.

C. The Sentencing

Powell argues that the district court erred in adopting a calculation of the mortgage fraud loss amount based upon the lenders' losses without evidence in the record that such losses were caused by Powell's fraud. This argument calls into question both the relevance and the adequacy of the evidence adduced at Powell's sentencing hearing. We first consider the issue of relevance.

As discussed above, the sentencing court retains broad discretion and may rely upon the defendant's relevant conduct, including all acts and omissions in a common scheme, which the government proves by a preponderance of the evidence. *See Hamaker*, 455 F.3d at 1336-38. According to the Guidelines commentary, in order for two or more offenses to constitute part of a common scheme, "they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar <u>modus</u> <u>operandi</u>." U.S.S.G. § 1B1.3 cmt. n.9(A). As Diejuste testified, all of these factors are present: In numerous instances, Powell used the same properties and the same straw buyers to defraud the same banks. Powell was the mortgage broker, and Antoine was her accomplice in most cases. In all cases, Antoine and Powell's common purpose was to enrich themselves by inducing banks to fund fraudulent mortgages based on false loan applications. And each episode of their common scheme followed a familiar pattern. Clearly, the conduct for which Diejuste gave evidence is relevant for the purpose of Powell's sentencing.

Next, we consider the adequacy of the evidence. "The district court's factual findings for purposes of sentencing may be based on, among other things, evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing." *United States v. Polar*, 369 F.3d 1248,

21

1255 (11th Cir. 2004) (citation omitted).  At trial, the government proved Powell's guilt of fraud beyond a reasonable doubt in six real estate transactions, resulting in a total loss of over $843,000.[11]  At sentencing, Diejuste's testimony established, by a preponderance of the evidence, that Powell intentionally participated in mortgage fraud resulting in a total loss of well over $2.5 million.  For example, between July 17, 2006 and September 6, 2006, Powell paid a single straw buyer, Winsome Ellis, in exchange for the use of Ellis' personal identifying information to submit fraudulent loan applications for the purchase of four properties.  Diejuste calculated the total loan losses attributable to these four transactions alone to exceed $2.47 million.  This example speaks to both the relevance of the conduct and the adequacy of the evidence.  Adding these losses to those established at trial puts the total loan loss amount above $3.31 million.

It is clear that the government presented sufficient evidence of Powell's relevant conduct to justify the district court's specific calculation of a loss amount in excess of $2.5 million, thus warranting an 18-level increase to Powell's base offense level under the Guidelines.  Accordingly, we affirm the district court's sentence.

## IV.    CONCLUSION

---

[11] This deliberately conservative figure is supported by the total restitution of $843,402.94 that the district court ordered Powell to pay.  According to the spreadsheet that Diejuste relied upon at the sentencing hearing, the total loss amount attributable to the same real estate transactions is over $880,000.

For the foregoing reasons, the convictions and sentence are AFFIRMED.