[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-12366

_____

D.C. Docket No. 1:12-cr-00489-KOB-JEO-1

UNITED STATES OF AMERICA,

Plaintiff-Appellant
Cross Appellee,

versus

SEAN ERIC SLATON,

Defendant-Appellee
Cross Appellant.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

(September 14, 2015)

Before ED CARNES, Chief Judge, JILL PRYOR and BLACK, Circuit Judges.

ED CARNES, Chief Judge:

A jury found Sean Eric Slaton guilty of 33 crimes, all of which stemmed from his receipt of federal worker's compensation from July 2011 through March 2013.  In sentencing him for those crimes, the district court calculated his advisory guidelines range as 18–24 months imprisonment but did not sentence him to any incarceration time.  That prompted the government to appeal the sentence as substantively unreasonable.  Slaton has cross-appealed and contends that the evidence was insufficient to convict him on 29 of the 33 counts alleged in the indictment.  He also challenges two aspects of his sentence as procedurally unreasonable, namely:  (1) the district court's calculation of the special assessment amount; and (2) its calculation of the loss amount, which impacted both his advisory guidelines range and the restitution amount.

## I.

Slaton, a resident of Anniston, Alabama, was a letter carrier for the United States Postal Service in Birmingham.[1]  He injured his back in August 2001 when another vehicle struck his mail truck.  Although he initially felt "fine," he sought medical attention for his back nearly a year later in July 2002.  Slaton's treating physician, Dr. Maddox, traced the source of Slaton's pain to two torn discs in his lower back, an injury that he thought was permanent and would grow progressively

---

[1] Because the district court denied Slaton's motion for judgment of acquittal, we recount the facts of this case in the light most favorable to the government and draw all reasonable inferences in favor of the jury's guilty verdicts on all counts.  See United States v. Hernandez, 743 F.3d 812, 814 (11th Cir. 2014).

worse.  That September, Slaton applied for worker's compensation.  In December, the Department of Labor (DOL) deemed him disabled and awarded him worker's compensation benefits.

From November 2002 until September 2003, the Postal Service attempted to return Slaton to work by offering him a number of "limited-duty" positions, or jobs that would have accommodated his physical limitations.  But one restriction in particular was an obstacle in the way of its efforts.  After Slaton had "complained that . . . driving was bothering him," his treating physician instructed him not to drive for more than 30 minutes at a time.  All of the work that the Postal Service was offering, however, was located in the Birmingham area, more than 30 minutes from Slaton's home in Anniston.  Because the Postal Service could not find him a limited-duty position closer to his home, Slaton remained unemployed and received worker's compensation benefits for more than a decade.[2]

Slaton has seen Dr. Maddox on a monthly basis since he first sought treatment in July 2002.  In 2003, Dr. Maddox began to prescribe Slaton narcotics.  In February 2009, he implanted into Slaton's back a spinal cord stimulator, a device that stimulates the spinal cord with electricity to alleviate pain and increase functionality.  Despite Dr. Maddox's efforts to treat his back injury, however,

---

[2] To be more precise, there was one interruption in Slaton's decade-long receipt of benefits.  In April 2005, DOL terminated his benefits based on one doctor's opinion that Slaton's injury no longer prevented him from returning to work as a letter carrier.  In March 2006, however, DOL reinstated Slaton's benefits based on Dr. Maddox's contrary opinion.

Slaton continued to complain of pain.  Between 2009 and 2012, he routinely reported pain levels that interfered with his daily living.  Indeed, he rated his pain at "a seven, [a] seven and a half[,] or an eight."  Seven means "cannot concentrate, interferes with sleep" and "[s]tronger pain killers are only partially effective"; eight means "[n]ausea and dizziness set in as facets [of] pain" and "physical activity is severely limited."

At least as of June 2011, however, Slaton's daily life bore little or no resemblance to the life of debilitating pain he described to Dr. Maddox.  That month, Slaton began to date a woman named Jennifer Ginn, and the two spent a lot of time together until they broke up in March 2012.  During the nine months that they were dating, Slaton worked out with Ginn at the gym for at least an hour five to seven times per week.  Without any apparent difficulty, he performed weight-lifting routines using both weight machines and free weights.  He also did the work of remodeling his own home and helped Ginn remodel portions of hers.  And he regularly drove long distances without problems:  he attended a motocross event with his sons in Birmingham, took a trip to the Gulf Coast, and drove Ginn round-trip to Little Rock, Arkansas.  Slaton was not increasingly dependent on his spinal

4

cord stimulator as he engaged in those physically demanding activities.  Instead, he rarely used it.[3]

In late 2011, a few months after Slaton had started dating Ginn, his file came under scrutiny at the Postal Service Office of Inspector General (OIG).  The file caught OIG's eye for several reasons, among them Slaton's age at the time of his injury (27) and how long he had been unemployed (9 years).  The following February, the Postal Service began to have an investigator surveil Slaton.  The investigator kept tabs on Slaton for four months and logged 160 hours of surveillance.  During that time, the investigator captured on video Slaton's daily life in Anniston.  Many of the videos showed him working out without any apparent difficulty, and one even showed him lifting well over 100 pounds.  The Postal Service also sent agents to interview Ginn, who by that time was no longer dating Slaton.

In March 2012, while OIG's investigation was still underway, its agents showed Dr. Maddox surveillance videos and still shots of Slaton's workouts.  Dr. Maddox had not known that Slaton frequented the gym and told the agents that "[t]he activity might have been more excessive than what was being relayed."  After the meeting, Dr. Maddox completed a Work Capacity Evaluation in which he

---

[3] A report obtained from the device's manufacturer would later show that, in the 19,176 hours from August 5, 2010, through October 11, 2012, Slaton used the device for only 369 hours — a usage rate of approximately 1.9%.

stated that, although Slaton was unable to perform the job of a letter carrier, he (Dr. Maddox) would like to review "a modified job offer."  Additionally, he grew "concerned enough to order a repeat [F]unctional [C]apacity [E]valuation to reassess what [Slaton's] capabilities were."

Physical therapist Rashad Pearson conducted Slaton's Functional Capacity Evaluation in early May 2012.  Over the course of two days, Pearson interviewed Slaton about his physical capabilities and led him through various exercises to test his strength and range of motion.  Pearson's report summarized Slaton's self-assessments and made specific findings about the type of work that Slaton could do on a daily basis.  According to that report, Slaton told Pearson that he was "unable to sit, stand, [or] lie for extended periods of time without [using his spinal cord] stimulator."  He also said that he had started "walking regularly for exercise" earlier that year.  And he rated his pain at a seven and stated that his goal was "to live as close to normal as [he] use[d] to."  As for Slaton's capabilities, Pearson reported that Slaton could handle light-demand work on a daily basis.  Dr. Maddox later reviewed the report and communicated the results of it to DOL.

Later that month, two OIG agents interviewed Slaton.  The agents introduced themselves as case managers with the Post Office and did not identify themselves as law enforcement.  They told Slaton that they wanted to gather facts about his worker's compensation and see if he could return to work in some

6

capacity.  In response to the agents' questions, Slaton told them that he lived in constant pain and that he regularly used his spinal cord stimulator.  He also stated that he could not sit, stand, or sleep for long periods, and that he could not lift more than 21–30 pounds.  As for exercise, he told the agents that he walked and lifted an 18-pound bar at home.  In addition to answering the agents' questions, Slaton filled out two forms (a Work Capacity Evaluation and a Current Capacity Evaluation) that contained many of those same representations.

In late 2012, OIG agents presented their findings to DOL.  That November, DOL sent Slaton a letter notifying him that it intended to terminate his benefits.  The letter stated that, based on the "medical evidence," Slaton could perform the job of a city letter carrier, the position he had held when he was injured.  Slaton responded that, although certain reports from his treating physician did state he was able to perform his date-of-injury position, other reports from the same physician indicated just the opposite.  Slaton's response arrived at DOL's mailroom on December 26, 2012, the day it issued its decision to terminate his benefits.  After DOL realized that its decision and Slaton's response had crossed in the mail, a senior claims examiner discussed with Slaton the decision to terminate and considered his response.  DOL later vacated its December 2012 decision and reinstated Slaton's benefits because the evidence that he could perform his date-of-injury position "was not as clear as [DOL would have] like[d]."  In reaching that

conclusion, DOL relied on Dr. Maddox's March 2012 Work Capacity Evaluation, in which he stated that Slaton was unable to perform the work of a letter carrier.[4]

## II.

In March 2013, Slaton was charged by indictment with 33 crimes:  8 counts of making false statements to obtain federal worker's compensation, in violation of 18 U.S.C. §§ 1920 and 2 (Counts 1–8); 24 counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Counts 9–32); and 1 count of theft of government property, in violation of 18 U.S.C. § 641 (Count 33).  Most of the charges arose during the time period from July 2011 through March 2013, or roughly from the beginning of Slaton's relationship with Ginn until a couple of months after DOL reinstated his benefits.

A six-day jury trial took place in July 2013.  At the close of the government's case, Slaton moved under Federal Rule of Criminal Procedure 29(a) for a judgment of acquittal as to all 33 counts.  The district court withheld ruling on Counts 2–4 and denied Slaton's motion on the remaining counts.  Slaton did not present a defense case and renewed his Rule 29 motion.  The court reiterated its earlier ruling, still withholding ruling on Counts 2–4.  The jury found Slaton guilty on all 33 counts.

---

[4] Slaton continued to receive benefits up to and through his trial.  The payments ceased when he was convicted.

Slaton later moved for a judgment of acquittal as to all 33 counts under Federal Rule of Criminal Procedure 29(c)(1), or, in the alternative, for a new trial under Federal Rule of Criminal Procedure 33.  The court denied that motion, letting the convictions stand on all 33 counts.

At Slaton's sentence hearing, the district court calculated his advisory guidelines range as 18–24 months imprisonment, overruling his objection to the loss amount in the process.  After considering the 18 U.S.C. § 3553(a) factors, however, the court chose not to sentence Slaton to a term of imprisonment. Instead, it sentenced him to a three-year term of probation, which included a six-month period of home confinement.  It also required him to pay a special assessment of $3,300 and restitution in the amount of $100,377.25, which was equivalent to the loss amount it had calculated under the sentencing guidelines.

The government appealed the sentence, and Slaton cross-appealed his convictions on 29 of the 33 counts (all but Counts 5–8) as well as his sentence.

### III.

We will address Slaton's challenge to his convictions on Counts 1–4 and 9–33 in three parts.  Part III.A addresses his sufficiency of the evidence argument with respect to Counts 1 (making false statements to obtain worker's compensation) and 9–32 (wire fraud).  Part III.B addresses his sufficiency of the evidence argument with respect to Counts 2–4 (making false statements to obtain

9

worker's compensation).  Part III.C addresses his sufficiency of the evidence argument with respect to Count 33 (theft of government property).

We review de novo a district court's denial of a motion for judgment of acquittal, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the jury's verdict.  See United States v. Hernandez, 743 F.3d 812, 814 (11th Cir. 2014).  We will not overturn a jury's verdict if there is "any reasonable construction of the evidence [that] would have allowed the jury to find the defendant guilty beyond a reasonable doubt."  United States v. Friske, 640 F.3d 1288, 1291 (11th Cir. 2011) (quotation marks omitted).

### A.

Slaton contends that the evidence was insufficient to convict him on Counts 1 and 9–32.  Count 1 charged him with worker's compensation fraud under 18 U.S.C. §§ 1920 and 2, alleging a scheme to defraud based on an aiding and abetting theory.  It alleged that Slaton knowingly made material misrepresentations and omissions to DOL and the Postal Service about his physical abilities, activities, and limitations from July 2011 through at least March 2013 (the date of the indictment).  Counts 9–32 charged Slaton with wire fraud under 18 U.S.C. §§ 1343 and 2 for using wire communications as part of a scheme to defraud the United States during that same time period; there was a separate charge for each time

10

Slaton received a payment in his bank account to which he was allegedly not entitled.

To convict Slaton of worker's compensation fraud, the government had to prove that he:  (1) "knowingly and willfully"; (2) misrepresented or concealed "a material fact"; (3) "in connection with the application for or receipt of [worker's] compensation."  18 U.S.C. § 1920.  To convict Slaton of wire fraud, the government had to prove that he:  (1) intentionally participated in a scheme to defraud another of property or money; and (2) used, or caused to be used, wire transmissions to execute that scheme to defraud.  18 U.S.C. § 1343; see United States v. Ward, 486 F.3d 1212, 1222 (11th Cir. 2007).  To prove the existence of a "scheme to defraud," the government had to show that Slaton misrepresented or concealed a material fact.  See United States v. Maxwell, 579 F.3d 1282, 1299 (11th Cir. 2009).  A misrepresentation or omission is material "if it has a natural tendency to influence, or is capable of influencing, the decision maker to whom it is addressed."  Id. (alteration and quotation marks omitted); see Neder v. United States, 527 U.S. 1, 16, 119 S. Ct. 1827, 1837 (1999).

In making its case against Slaton on Counts 1 and 9–32, the government relied on an aiding and abetting theory.  See 18 U.S.C. § 2(b).  It sought to show that Slaton made material misrepresentations or omissions to his doctors, who in turn innocently relayed that materially false or incomplete information to DOL and

11

the Postal Service.  In other words, the government's aiding and abetting theory treated the doctors as direct conduits of information between Slaton and those he allegedly defrauded.  See United States v. Hornaday, 392 F.3d 1306, 1313 (11th Cir. 2004) (observing that 18 U.S.C. § 2(b) was "designed for[] the situation in which a defendant with the requisite intent to commit a crime gets someone else to act in a way necessary to bring about the crime, even if that other person is innocent"); United States v. Tobon-Builes, 706 F.2d 1092, 1099 (11th Cir. 1983) ("[I]t is well established that [18 U.S.C.] § 2(b) was designed to impose criminal liability on one who causes an intermediary to commit a criminal act, even though the intermediary who performed the act has no criminal intent and hence is innocent of the substantive crime charged.").

A reasonable jury could have found Slaton guilty on Counts 1 and 9–32 based on the government's aiding and abetting theory.  There was plenty of evidence showing that he made misrepresentations to his medical providers and that those misrepresentations could have impacted DOL's decision to award him worker's compensation.  For example, the evidence showed that, in May 2012, Slaton grossly misrepresented his physical abilities and activities to the physical therapist who conducted his Functional Capacity Evaluation.  He said that he was "unable to sit, stand, [or] lie for extended periods of time without [using his spinal cord] stimulator" and that he had started "walking regularly for exercise" earlier

12

that year.  In fact, Slaton rarely used his spinal cord stimulator and regularly engaged in strenuous workouts at the gym, much more vigorous exercise than just "walking regularly."  The evidence also showed that Slaton's treating physician adopted the results of the Functional Capacity Evaluation and communicated false information about Slaton's physical capabilities to DOL.  And the evidence showed that the information Slaton misrepresented was exactly the type of information that was "capable of influencing" DOL's decision to award him benefits.  Maxwell, 579 F.3d at 1299 (quotation marks omitted).  For example, a DOL senior claims examiner testified that the "vast majority" of documents DOL obtains from an individual who is receiving benefits is "medical evidence," including "notes from physical therapists [and] physicians."  The claims examiner also answered in the affirmative when asked if it was "important for [DOL] to know what someone can do and cannot do" in order to evaluate a claimant's ability to work.

Because a reasonable jury could have found beyond a reasonable doubt that Slaton caused his treating physician to submit materially false information to DOL and the Postal Service, we affirm his convictions on Counts 1 and 9–32.

B.

Slaton also contends that the evidence was insufficient to convict him on Counts 2–4.  Those three counts arose out of the May 2012 meeting between

13

Slaton and OIG agents posing as Postal Service employees.  Generally, they allege that Slaton knowingly made material misrepresentations to the Postal Service in connection with his receipt of worker's compensation in violation of 18 U.S.C. §§ 1920 and 2.  As we have already discussed, to convict Slaton on Counts 2–4, the government had to prove that he:  (1) "knowingly and willfully"; (2) misrepresented or concealed "a material fact"; (3) "in connection with the application for or receipt of [worker's] compensation."  18 U.S.C. § 1920.

Slaton does not dispute that he knowingly made material misrepresentations to the Postal Service during the May 2012 meeting.  Instead, he contends that those statements were not made "in connection with the application for or receipt of" benefits as required by 18 U.S.C. § 1920.  He argues that his statements at the May 2012 meeting would have been made "in connection with" his receipt of benefits only if those statements had been relayed to DOL, the agency with the sole authority to administer the benefits.  According to Slaton, the evidence at trial did not show that his statements had been relayed to DOL.

Slaton's argument fails.  Counts 2–4 charged him with knowingly making material misrepresentations to the Postal Service in connection with his receipt of benefits.  Unlike Counts 1 and 9–32, they did not charge him with knowingly making material misrepresentations to DOL.  Nor did they need to.  18 U.S.C. § 1920 is a broadly worded statute that criminalizes making any false statement of

14

material fact <u>in connection with</u> the receipt of worker's compensation.  It does not specify that the false statement must be made to DOL.  <u>See</u> 18 U.S.C. § 1920 (providing that "[w]hoever knowingly and willfully falsifies, conceals, or covers up a material fact, or makes a false, fictitious, or fraudulent statement or representation, or makes or uses a false statement or report knowing the same to contain any false, fictitious, or fraudulent statement or entry in connection with the application for or receipt of compensation or other benefit or payment" is guilty of worker's compensation fraud).  As a result, to obtain convictions on Counts 2–4, the government did not have to prove that the Postal Service relayed Slaton's statements to DOL.  Instead, as the district court instructed the jury, it was enough for the government to show that Slaton knowingly made material misrepresentations to the Postal Service in connection with his receipt of benefits.

The government did that.  The evidence showed that the OIG agents told Slaton in no uncertain terms that the purpose of the meeting was to gather facts about his worker's compensation and see if he could return to work in some capacity.  Slaton does not dispute that the information he gave to those agents about his physical abilities and activities was materially false.  Based on that evidence, a reasonable jury could have found that Slaton's materially false statements were made "in connection with" his receipt of benefits.  We affirm his convictions on Counts 2–4.

15

C.

Finally, Slaton contends that the evidence was insufficient to convict him on Count 33, which charged him with knowingly stealing worker's compensation from DOL and the Postal Service from July 2011 through March 2013, in violation of 18 U.S.C. § 641.  To convict Slaton of violating 18 U.S.C. § 641, the government had to prove three elements beyond a reasonable doubt:  "(1) that the money or property belonged to the government; (2) that the defendant fraudulently appropriated the money or property to his own use or the use of others; [and] (3) . . . that the defendant did so knowingly and willfully with the intent either temporarily or permanently to deprive the owner of the use of the money or property."  United States v. McRee, 7 F.3d 976, 980 (11th Cir. 1993) (en banc).

A reasonable jury could have found Slaton guilty on Count 33.  A DOL senior claims examiner testified that a claimant's worker's compensation must cease once he can work a limited-duty positon with the same salary as his date-of-injury position, whether or not such a limited-duty position is available.  That means Slaton's conviction on Count 33 was proper if he could have done that during the offense period, and he misrepresented or concealed information that would have allowed the Postal Service to determine that he could.

That's exactly what the evidence showed.  The claims examiner testified that, in September 2003, Slaton turned down an offer for a limited-duty position in

16

the Birmingham area because his treating physician, Dr. Maddox, had cleared him only for light-demand work located within 30 minutes of his home in Anniston. Dr. Maddox testified that he imposed the driving restriction because Slaton had "complained [that] driving was bothering him." Slaton's ex-girlfriend testified that, between June 2011 and March 2012, Slaton drove to and from Birmingham, the Gulf Coast, and Little Rock, Arkansas without any apparent difficulty. A reasonable jury could have found beyond a reasonable doubt that driving was no longer "bothering" Slaton during the offense period, and that, by knowingly concealing this fact from Dr. Maddox, he obtained worker's compensation to which he was not entitled. We affirm Slaton's conviction on Count 33.

## IV.

Having rejected Slaton's challenge to his convictions, we turn now to the challenges he and the government make to his sentence.

### A.

The district court imposed a $3,300 special assessment on Slaton, which it calculated by multiplying $100 times the number of counts of conviction (33). Slaton contends that was a miscalculation, the government agrees, and so do we.

Imposition of a special assessment is mandatory, but the amount of it depends on whether the conviction was for a felony or a misdemeanor and, if a misdemeanor, what class. See 18 U.S.C. § 3013(a)(2)(A) (providing a special

17

assessment of $100 for a felony conviction); id. § 3013(a)(1)(A)(iii) (providing a special assessment of $25 for a Class A misdemeanor conviction). The district court's error was in treating Slaton's eight misdemeanors as felonies for purposes of calculating the special assessment. Slaton was convicted of 25 felony offenses (Counts 9–33) for which special assessments totaling $2,500 (25 x $100) should have been imposed, and he was convicted of eight Class A misdemeanor offenses (Counts 1–8) for which assessments totaling $200 (8 x $25) should have been imposed. Adding his felony and Class A misdemeanor assessments, the correct amount of the special assessment is $2,700. The district court will need to correct the error on remand.

## B.

Slaton also contends that the district court erred in finding that the total loss to the Postal Service during the offense period was $100,377.25. That amount is the sum of three figures: (1) $70,005.16 in worker's compensation benefits (payments that the Postal Service made to Slaton through DOL); (2) $25,592.23 in medical benefits (payments that the Postal Service made to Slaton's medical providers through DOL); and (3) $4,779.87 in administrative fees associated with the payments made to Slaton or his medical providers (payments that the Postal Service made to DOL).[5] We review the court's interpretation of the loss guideline

---

[5] A one-cent error crept in somewhere, but we disregard it.

de novo and its determination of the loss amount only for clear error. See

Maxwell, 579 F.3d at 1305.

Slaton makes four arguments about the loss amount. As a general matter, he

argues that the district court should have calculated loss by using the sentencing

guidelines' "net loss" approach, which is found in application note 3(F)(ii) of

section 2B1.1. Titled "Government Benefits," that application note provides as

follows:

> In a case involving government benefits (e.g., grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be. For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50.

U.S.S.G. § 2B1.1 cmt. n.3(F)(ii). Slaton asserts that the net loss approach would

properly account for the fact that he had been entitled to at least some of the

benefits he received during the offense period.

He contends that, under the net loss approach, the loss amount the district

court arrived at was too high for three reasons. First, he argues that the loss

amount should not have included his medical benefits (and the administrative fees

associated with those benefits) because he actually was entitled to receive medical

treatment for his permanent back injury. He also argues that the loss amount

19

should not have included his worker's compensation benefits (and the associated administrative fees) because he actually was entitled to receive those benefits as well. Alternatively, he argues that the loss amount should not have included all of his worker's compensation benefits because he actually was entitled to receive some government benefits during the offense period regardless of his fraud. Slaton points out that, after he was injured, the Office of Personnel Management approved him for disability retirement benefits. However, he elected to receive worker's compensation from the Postal Service instead. Those benefits were terminated following his convictions, and he now receives disability retirement benefits. Putting those pieces together, Slaton argues that the court should have reduced the loss associated with his receipt of worker's compensation by the amount of disability retirement benefits he could have received without fraud during the offense period because that was a government benefit he was entitled to receive. Slaton's argument depends on the proposition that the true victim in this case is not the Postal Service, but the "United States as a whole."

The district court overruled Slaton's objection to the loss amount because there was no "legal basis on which to sustain it." In context, the court's statement was directed at Slaton's position that an offset was warranted against the loss associated with his receipt of worker's compensation. But the court made no determination as to whether the sentencing guidelines' net loss approach governed

the loss calculation.  Nor did it make any finding about whether Slaton was entitled to the any of the benefits he received.

The sentencing guidelines' net loss approach "addresses how loss is to be calculated when the [defendant's] fraud or deceit involves a Government Benefits program."  Maxwell, 579 F.3d at 1306.  Because worker's compensation is a government benefit, the guidelines' net loss approach governs the loss calculation in a fraud case involving worker's compensation.  See United States v. Catone, 769 F.3d 866, 875–77 (4th Cir. 2014); United States v. Boring, 557 F.3d 707, 713–14 (6th Cir. 2009); United States v. Harms, 442 F.3d 367, 379–80 (5th Cir. 2006); United States v. Tupone, 442 F.3d 145, 153–56 (3d Cir. 2006).

Because the sentencing transcript does not indicate that the district court calculated loss by using the net loss approach, a remand is necessary to allow the court to do so.  In applying that approach, the court should determine whether Slaton was entitled to the medical benefits he received during the offense period. It need not, however, determine whether he was entitled to the worker's compensation he received.  The jury's guilty verdict on Count 33, when considered in conjunction with its guilty verdicts on Counts 9–32, establishes that Slaton was not entitled to any worker's compensation during the offense period.

Here's why.  Counts 9–32 charged that Slaton knowingly, and with the intent to defraud DOL and the Postal Service, made material misstatements or

omissions in connection with each and every payment of worker's compensation that he received during the offense period. The court properly instructed the jury that it could find Slaton guilty on those counts even if he did not actually succeed in defrauding DOL and the Postal Service; it was enough for the jury to find that his misstatements or omissions were capable of influencing their decisions. See Neder, 527 U.S. at 16, 119 S. Ct. at 1837; Maxwell, 579 F.3d at 1299. As a result, had the indictment ended at Count 32, Slaton might have had room to argue — and the district court room to find — that he did not actually succeed in defrauding DOL and the Postal Service, and that he was therefore entitled to the worker's compensation he received in spite of the material misstatements or omissions that he made. But the indictment did not end there.

The indictment also charged, in Count 33, that Slaton successfully defrauded DOL and the Postal Service and stole "$47,120.82 of Workers' Compensation Benefits to which he knew he was not entitled," which is the sum of all of the individual amounts charged in Counts 9–32.[6] In finding Slaton guilty on Count 33, the jury necessarily found that each and every payment of worker's compensation that he received during the offense period was fraudulently obtained — that Slaton

---

[6] At sentencing, the court found by a preponderance of the evidence that the loss associated with Slaton's receipt of worker's compensation benefits was not $47,120.82, but $70,005.16. Slaton does not dispute that the court properly applied relevant conduct principles to include in the loss amount $22,884.34 of additional worker's compensation payments that were not specifically alleged in the indictment. See U.S.S.G. § 1B1.3.

22

was not entitled to any of those payments.  As a result, a finding by the district court that Slaton was entitled to any amount of worker's compensation benefits during the offense period would contradict the non-contradiction principle.  That principle prohibits a sentencing court from finding a fact that is inconsistent with any of the findings that are necessarily implicit in the jury's guilty verdict.  See United States v. Mateos, 623 F.3d 1350, 1369 (11th Cir. 2010) (opinion of O'Connor, J.) (stating that the district court in sentencing might "have abused its discretion if it had given [the exculpatory results of a polygraph exam] any weight at all, insofar as they contradicted the jury's verdict" on an element of the charged healthcare fraud); United States v. Bertling, 611 F.3d 477, 481 (8th Cir. 2010) ("[A] district court errs as a matter of law if it imposes a sentence based on a finding that contradicts the jury's verdict.") (alteration and quotation marks omitted); United States v. Hunt, 521 F.3d 636, 649 (6th Cir. 2008) ("[A] factual determination is necessarily clearly erroneous where a jury has previously found to the contrary beyond a reasonable doubt."); United States v. Curry, 461 F.3d 452, 461 (4th Cir. 2006) ("The court erred . . . in sentencing [the defendant] based on a conclusion that contravened the jury's verdict."); United States v. Rivera, 411 F.3d 864, 866 (7th Cir. 2005) ("[I]t is both unnecessary and inappropriate for the judge to reexamine, and resolve in the defendant's favor, a factual issue that the jury has resolved in the prosecutor's favor beyond a reasonable doubt."); United States v.

23

Weston, 960 F.2d 212, 218 (1st Cir. 1992) ("[A] guilty verdict, not set aside, binds the sentencing court to accept the facts necessarily implicit in the verdict."), abrogated in part on other grounds by Stinson v. United States, 508 U.S. 36, 113 S. Ct. 1913 (1993).[7]

That leaves Slaton's novel "offset" theory, which would have the court use the net loss approach to offset the loss to the Postal Service by the money Slaton could have received from a different federal agency during the offense period in spite of his fraud. The district court properly rejected that theory as one with no legal basis. The victim in this case was not, as Slaton contends, "the United States as a whole." The victim was the Postal Service, the specific federal agency that employed Slaton and paid him worker's compensation through DOL. Slaton was convicted of scheming to defraud, and stealing from, the Postal Service. The loss from that crime is not diminished because he was eligible for benefits from another agency.

---

[7] A court, of course, may properly take into account the relevant conduct of which a defendant was acquitted in sentencing him for a particular crime. See United States v. Siegelman, 786 F.3d 1322, 1332 n.12 (11th Cir. 2015); United States v. Smith, 741 F.3d 1211, 1226–27 (11th Cir. 2013); United States v. Culver, 598 F.3d 740, 752–53 (11th Cir. 2010). The reason a court may consider acquitted conduct in sentencing is that a court's finding that a fact has been proven by a preponderance of the evidence is consistent with a jury's finding that the same fact has not been proven beyond a reasonable doubt. By contrast, a court must find that a fact was proven by a preponderance of the evidence if the jury verdict establishes it was proven beyond a reasonable doubt. These statements of law are consistent because the standard of proof for conviction is higher than the standard for finding a fact at sentencing.

On remand, the district court should recalculate the loss amount by using the sentencing guidelines' net loss approach.  In applying that approach, the court should make a factual finding as to whether Slaton was entitled to any of the medical benefits he received during the offense period and adjust the loss amount accordingly.  The court's newly calculated loss amount will not impact Slaton's advisory guidelines range, because even if the court finds that he was entitled to all of the medical benefits, the loss will still be greater than $70,000, warranting the same 8-level sentencing enhancement that he received.  See U.S.S.G. § 2B1.1(b)(1)(E).  A new loss amount can impact only the restitution amount, which is equivalent to the loss amount in a worker's compensation fraud case.  See Catone, 769 F.3d at 877 ("[T]he restitution amount in a government-benefits case depends on the loss amount calculated under the Guidelines."); Boring, 557 F.3d at 714 ("[T]he district court may not include in its calculation of a restitution award the worker's compensation payments to which [the defendant] was legitimately entitled, since those do not constitute losses to the victim and thus are not properly the subject of restitution.").

## C.

The district court's error in calculating the loss amount did not affect Slaton's advisory guidelines range, and the court told us that it would have imposed the same non-incarceration sentence regardless of how it had resolved

25

Slaton's objection to the loss amount.  Under those circumstances, we would ordinarily move on to consider the government's challenge to the substantive reasonableness of the sentence.  See United States v. Keene, 470 F.3d 1347, 1348–50 (11th Cir. 2006).  But we do not reach the substantive reasonableness issue here because the district court made another procedural error that was not related to its calculation of the advisory guidelines range but may have affected its decision to vary downward:  basing Slaton's non-incarceration sentence on a clearly erroneous fact.  See Gall v. United States, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007) (providing several examples of procedural errors, including "selecting a sentence based on clearly erroneous facts"); United States v. Rodriguez, 628 F.3d 1258, 1264 (11th Cir. 2010) (same).

In explaining its decision to vary downward, the district court stated that Slaton did not deserve to go to prison because he "has already lost the worker's comp benefit to which he arguably would still have been entitled if he had been perfectly honest with his doctors and investigators."  That statement contradicts the jury's guilty verdict on Count 33.  As we have already explained, in finding Slaton guilty on that count, the jury necessarily found that he was not entitled to the worker's compensation benefits he received.  See supra Part IV.B.  As a result, the district court's statement that he "arguably" could have been entitled to any of

26

those benefits violates the non-contradiction principle and is clearly erroneous. That clear error may have affected the district court's decision to vary downward.

On remand, the district court should resentence Slaton without relying on any clearly erroneous facts. We do not reach and express no view on the issue of whether the non-incarceration sentence imposed would have been substantively reasonable without the errors that were committed in arriving at the sentence.

## V.

For the reasons discussed, we **AFFIRM** Slaton's convictions on all counts, **VACATE** his sentence, and **REMAND** for resentencing. On remand, the district court should impose a special assessment of $2,700. It should also recalculate the loss amount by using the sentencing guidelines' net loss approach, U.S.S.G. § 2B1.1 cmt. n.3(F)(ii), and order Slaton to pay restitution in that amount, whatever it may be. Finally, the court should resentence Slaton without relying on findings that contradict what the jury found beyond a reasonable doubt. The court is free to revisit any other aspect of the sentence, although we express no opinion on what a reasonable sentence would be.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART.**